STATE of Tennessee, Appellee,

v.

Perry CLAYTON, III, Appellant.

Supreme Court of Tennessee,
at Jackson.

Aug. 29, 1983.

Walker Gwinn, Asst. Public Defender, Memphis, for appellant; A.C. Wharton, Jr., Shelby Co. Public Defender, Memphis, of counsel.

William M. Leech, Jr., Atty. Gen., Jennifer Helton Small, Asst. Atty. Gen., Nashville, Joseph L. Patterson, Sidney P. Alexander, Asst. Dist. Attys., Memphis, for appellee.

## OPINION

DROWOTA, Justice.

The Defendant, Perry Clayton, III, appeals a conviction of first degree murder for which he received a life sentence in the state penitentiary. At trial, the Defendant relied upon the defense of insanity. The primary issue on appeal is whether the evidence supports the jury verdict that the Defendant was sane at the time the offense was committed. Both the jury and a majority of the Court of Criminal Appeals rejected Clayton's insanity defense.

The actual facts of the crime itself are undisputed. On July 2, 1979, the Defendant observed the 12-year-old victim, Preston Porter, and two other children walking by an apartment complex. The victim was separated from his two friends and, for no apparent reason, the Defendant approached the young boy and fatally stabbed him eleven times. The victim was heard to yell, "Hey, man, what you doing?" At one time the knife blade bent and the Defendant placed it on the ground to straighten it out. Then he stabbed the victim again. The Defendant committed the acts in broad daylight, in the presence of witnesses, both children and adults. When shouted at, the Defendant fled until he suddenly stopped and surrendered to the adults who pursued him. He dropped the murder weapon and stood with his foot over it. He told his pursuers that he was "sick, call the police" and "I give up. Don't ya'll kill me." Once apprehended, he obeyed instructions, sat quietly and was no longer violent. His peaceful behavior continued once he was in the custody of the police, where he waived his *Miranda* rights and gave a signed statement concerning the crime.

The determination as to the manner in which the defense of insanity may be presented to a jury has been left to the States. *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968); *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). The method of presenting the insanity defense to a jury was established in Tennessee over a century ago. In *Collins v. State,* 506 S.W.2d 179 (Tenn.Cr.App.1973), the court points out that as to the insanity defense

"[t]he applicable principles of law were settled long ago in this State. The presumption of sanity places the burden of showing insanity at the time of commission of a crime upon him who asserts it as a defense. *Mullendore v. State* 183 Tenn. 53, 60, 191 S.W.2d 149 (1945); *Spurlock v. State,* 212 Tenn. 132, 134, 368 S.W.2d 299 (1963).

While the State is not bound to establish the defendant's sanity in the first instance, if the defendant's or the State's evidence raises a reasonable doubt as to the defendant's sanity, such evidence relieves the defendant of further proof upon that issue and shifts the burden of proof to the State [*Dove v. State,* 50 (3 Heis.) 348, 370–374 (1871) ], *Stuart v. State,* 60 (1 Baxt.) Tenn. 178 (1873); *King v. State,* 91 Tenn. 617, 648, 20 S.W. 169 (1892).

Whenever testimony is introduced countervailing the presumption of sanity and raising a question of the accused's insanity, the State must then establish his sanity to the satisfaction of the jury beyond a reasonable doubt. *Jordan v. State,* 124 Tenn. 81, 89, 135 S.W. 327 (1910); *Davis v. United States,* 165 U.S. 373, 378, 17 S.Ct. 360, 362, 41 L.Ed. 750, 754."

506 S.W.2d at 183–184; *Covey v. State,* 504 S.W.2d 387, 390–391 (Tenn.Cr.App.1973); Accord, *Graham v. State,* 547 S.W.2d 531, 544 (Tenn.1977). Sanity thus becomes an element of the crime.

In *Graham v. State,* 547 S.W.2d 531 (Tenn.1977), an opinion authored by the late Justice Joe Henry, this Court adopted the American Law Institute's Model Penal Code formulation of insanity:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to *appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.*

(2) As used in this Article, the terms 'mental disease or defect' do not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct. [emphasis added]." 547 S.W.2d at 543.

To prove sanity, the State must show that the Defendant could appreciate the wrongfulness of his conduct and had the capacity to conform his conduct to the requirements of the law.

Since Clayton has challenged the sufficiency of the State's evidence to convict him, a detailed review of the lay and expert testimony concerning Defendant's lack of mental capacity is deemed necessary because of the reviewing standards mandated in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Under *Jackson* and Rule 13(e), T.R.A.P., we must find sufficient evidence upon which any rational trier of fact could be convinced beyond a reasonable doubt of the Defendant's sanity. We feel Judge Daughtrey, in her dissenting opinion, accurately and objectively outlined the evidence offered by the defense and the State on the principal issue of Clayton's sanity at the time of the offense. We quote from her dissenting opinion:

"His mother, Vivian Clayton, chronicled a history of bizarre behavior on her son's part, dating back to the night of his father's funeral in 1973, when Clayton, then 17, told her he was afraid to go to bed for fear 'his father's body would get into his.' Clayton apparently joined the Navy shortly after this time, and was away from home in the service until late 1974 or early 1975.

"When he returned to Memphis after his 'unhonorable discharge' from the military, his mother began to notice a change in her son's behavior. He was withdrawn, had no friends, stopped dating, stayed in his room and would not talk to anyone. He developed serious sleep disturbances, pacing through the house all night. Eventually Clayton developed a paranoia about his mother, refusing to eat her cooking for fear she was trying to poison him. Because of his strange behavior with knives, Vivian Clayton took the precaution of hiding all the knives in the house. But to no avail: on one occasion Clayton repeatedly stabbed her in the stomach with a hair pick, as she lay napping on the living room couch; on another occasion he attacked her with a serrated steak knife, slitting her throat.

"At trial Clayton's mother and two of his sisters detailed other bizarre and abnormal behavior on his part: methodically knocking out window panes and crushing light bulbs; going from one door to the next in a pattern, repeatedly slamming each one, including cupboard doors; ritualistically arranging cigarettes around the room; emptying the contents of the refrigerator into the garbage, but telling his mother not to bother the empty milk cartons because 'they were Jesus.' From January 1979 to June 1979, the six months just before Preston Porter's death, Perry Clayton went on what his mother called a 'religious kick,' carrying a Bible with him at all times and refusing to allow any but religious music in the house. Vivian Clayton also described Perry Clayton's trance-like periods and said that he told her of hearing voices that 'tell me to do things.' He also expressed fear that people were talking about him and reading his mind.

"The record shows that between 1975 and 1979, Clayton was repeatedly admitted to at least four different hospitals in the Memphis area. For example, records of the

John Gaston Hospital on July 10, 1975, show that Clayton's admission on that date was 'his 3rd known psychiatric hospitalization.' He had previously been prescribed medication (Thorazine) at the VA facility, but had discontinued use of the medication after discharge. At the time of his July 1975 admission to John Gaston [after stabbing his mother with a hair pick], he was experiencing frequent auditory and occasional tactile hallucinations, and gave evidence of developed paranoia. Noting that 'the patient appeared to be struggling to maintain his grasp on reality,' the records show that Clayton was put on daily medication, including Haldol.

"In July 1976, Clayton was transferred to the Tennessee Psychiatric Hospital after another admission to John Gaston Hospital. He had been committed on a lunacy warrant after trying to kill his mother for a third time. The record indicates further that:

He also had approached relatives with obscene talk of sex and asked his own sisters to have sexual relations with him. He was talking to himself, refusing to bathe or change clothes, thinking that everyone turned against him; had withdrawn to his room, sitting on his bed with his head down staring for hours. He had not been taking medication for five months and his condition got progressively worse.... He admitted, upon admission, to having thoughts of hurting people.... He admitted to hearing voices and was obsessed with the thought of sex ... his main concern was hearing female voices making derogatory remarks about him.

Clayton was diagnosed as paranoid schizophrenic; he was put on an increased dosage of Haldol, and was later switched to Prolixin. The attending physician thought he 'should do well if he continues taking his medicine.' He was discharged after five weeks hospitalization.

"Four months later, in December 1976, Clayton was admitted to the Tennessee Psychiatric Hospital and Institute, again on referral from John Gaston. He reported to the doctors that his mother 'told me to come and seek admission as I was not acting all right.' Clayton was still hounded by a female voice deriding and cursing him, and he now thought the television was 'talking to him, cracking jokes about him.' He was unable to sleep and had developed tactile hallucinations ('ants crawling on neck and body'). He was described as 'untidy and disheveled' but well 'oriented to time, place, and person,' with good recent and remote memory. According to the discharge summary filed two weeks later, 'the[se] problems were brought under control by continuing on 10 mg. of Prolixin ... and [he] was referred to Frayser Mental Health Center for aftercare followup.' Again the diagnosis was paranoid schizophrenia.

"The next record of hospitalization is from John Gaston Hospital in the summer of 1978 [after beating up a man and taking money from him]. It reflects an interim hospitalization at the Memphis VA Hospital. Clayton was diagnosed as paranoid schizophrenic, after again complaining of hearing a woman's voice that came 'on and off' and disturbed his mind. He also continued to suffer delusions of persecution. He was given an initial dose of Haldol, but when it did not produce any improvement, the dosage was increased from 10 mg. to 60 mg. He continued to experience auditory hallucinations that 'people were holding a running commentary on his thoughts and giving him orders.' The Haldol was later discontinued and Clayton was put on Prolixin. His response was better, although he continued to hallucinate, and the staff concluded 'that the auditory hallucinations will probably be present despite whatever medication he will be on.' Clayton was then discharged to be carried as an outpatient.

"The first medical expert to see Clayton after his arrest on July 2, 1979, was Dr. John M. Kington, a Memphis psychiatrist who had been the director of several psychiatric programs (including the VA in Memphis and the Hospital for the Criminally Insane in Nashville) and was at the time retained by Shelby County to evaluate persons brought before the probate court for

civil commitment. On July 11, 1979, Dr. Kington ran into a member of the Memphis Public Defender's Office, who asked Kington to interview Clayton at the jail. Kington did, and what he found was a man 'obviously mentally ill.' In the doctor's words, Clayton was 'very dirty, unkempt, smelly, filthy, very sad, despondent, crying intermittently, confused.' Kington attributed the foul smell to the fact that Clayton had repeatedly urinated on himself, and he described Clayton's hair as a 'mess.' He said Clayton was much thinner than he appeared at trial, that he was hallucinating and apparently fearful that the devil was in him. Kington testified that he talked to Clayton for more than an hour, but that he didn't really need that much time 'because it was very obvious after just a few minutes that Mr. Clayton was very mentally ill.' Kington said further that there was little margin for mistaking a correct diagnosis: 'Mr. Clayton is a paranoid schizophrenic and at that time he was overtly psychotic.... In the lay sense, it means he's insane.'

"Kington testified without qualification that Clayton could not appreciate the wrongfulness of his action in stabbing Preston Porter. Asked if Clayton could conform his conduct to the requirements of the law at the time of the murder, the doctor said:

> By and large, no, sir. Now, when I say that, I'm referring to the fact that—He might be able to walk down the street and not pull all his clothes off and expose himself—But certain feelings that he would have, he could not control.

Dr. Kington further testified that Clayton was influenced by the voices 'talking to him, telling him things, directing things to him, calling him names, accusing him of things, telling him things that he should do.' Asked why Clayton, when apprehended, would say, 'Don't kill me, I'm sick,' the doctor answered by saying that most schizophrenics who have been in and out of hospitals several times 'know to some degree that they're getting sick,' Asked why the defendant would run after stabbing the child, the witness said Clayton probably ran because 'someone shouting at him would just scare him—he's scared of everything and everybody and he instinctively ran.' The doctor likened this action to a 'dog you yell at in the yard and it instinctively runs.'

"Dr. Kington had checked the jail records and verified Clayton's story that he was not then taking medication. The doctor said that he could tell what the defendant's condition was on July 2 by examining him nine days later on July 11 because the illness, in the absence of medication, follows a developmental pattern over a period of weeks:

> ... a person could not get as sick as Perry Clayton was at the time I saw him in the jail in just a few days. It would take weeks of deterioration to get to this point.... He could not have reached.... that degree of illness, that degree of a psychiatric emotional deterioration, in a period of nine days. And this is why I say I know, beyond any doubt in my mind, that he was sick nine days prior to that on July 2nd.

"Dr. Kington summarized Clayton's symptoms of paranoid schizophrenia as 'textbook classic ... most people that you see that are mentally ill just don't present [such] a textbook case.' The doctor noted that schizophrenia cannot be cured, only treated, and that if the schizophrenic patient cooperates with treatment, he or she will get better. But he cautioned that if such patients do not stay under treatment 'to stay under control,' they regress down hill into a psychotic state once again.

"The defendant was next seen some two weeks later on July 27 by Dr. Ben Bursten, a Yale Medical School graduate and Vice-Chairman of the Department of Psychiatry at the University of Tennessee School of Medicine. His specialty is forensic psychiatry.

"Dr. Bursten testified that at the time of his examination, the defendant was clearly mentally ill and was hallucinating. The doctor said it was 'very noticeable' that Clayton was hearing voices, because it was difficult for him to concentrate for any length of time and 'his eyes would wander

off—common signs of those who are reacting to voices.' After observing these symptoms, Bursten asked Clayton if he was hearing voices and Clayton admitted that he was and said that he had been hearing a woman's voice for a long time telling him 'do this or do that.'

"In addition to these hallucinations, Dr. Bursten also found that Clayton suffered from sleep disturbances ('frequently a sign of mental problems') and severe 'delusions or misunderstandings of reality.' For example, he said:

The color of cars is very important to him. One example being that if he sees a red car going by on the street he thinks that's a sign for me to indicate that what I'm doing is all right, because red, R, right. See, this is the slippage in the logic that I was talking about in terms of a psychosis. They don't think logically like we do, generally. The second point: If he sees a green car, green can mean either I'm doing good or I'm going to meet a girl. Green, G, girl. So this is the nature of the way he puts thoughts together, at times. Not all the time but at times. In general, however, when he talked to me about these things his sentences came across reasonably well connected, he was not difficult to understand. But underneath it is this kind of bedrock of thinking which is distorted, which is interpreting signs, and so on.

"Bursten testified that as of July 27 Clayton was still not on medication. He described Clayton's previously prescribed medications, Haldol and Prolixin, as drugs used to control hallucinations, saying they are 'the psychiatric big guns, if you will':

You don't give these to people who are feeling a little anxious. You give them to people who are indeed psychotic. And he [had previously received] substantial doses of them. He was being followed in the Southwest Mental Health Center, but apparently since the beginning of the year had stopped going and was not on medications.

"Dr. Bursten diagnosed Clayton as paranoid schizophrenic and noted that the onset of the illness is usually during an individual's post-adolescent years, from ages 18 to 22. He concluded that Clayton did not appreciate the wrongfulness of his act in killing Preston Porter on July 2, but 'thought he was doing something holy.' Nor was he able to conform his conduct to the requirements of the law, in Dr. Bursten's opinion.

"Finally, Dr. Bursten testified that although malingering can occur with those charged with crimes, he was certain that Clayton was not faking his symptoms. He based his conclusion on his expertise with the subject matter of malingering (about which he had written a book in 1973) and on the fact that Clayton's intelligence in the dull normal range made it highly unlikely that he possessed the sophistication to fake his symptoms so convincingly.

"The next expert to see Clayton was Dr. Herbert Wender, a psychiatrist with the Forensic Services Unit of the Tennessee Mental Health Center in Memphis, whose job it was to do court-ordered evaluations and treat jail inmates with psychiatric problems. He was asked by Dr. Bursten to come to the jail on July 27 to assume medical treatment of Perry Clayton.

"Dr. Wender described the defendant as confused, hallucinating, and hearing voices. He found that Clayton had formerly been put on Prolixin but had ceased medication some three to four months prior to arrest. He, too, described Clayton's physical response to the disembodied voices he was hearing and said, 'After seeing so many of these patients, it's clinically easy to tell if they're faking. I am absolutely certain he was not malingering.' Dr. Wender prescribed a daily dose of Haldol for Clayton.

"At trial Dr. Wender described Haldol and Prolixin as very potent antipsychotic drugs. The distinction, he noted, is that Prolixin is given every two weeks by injection; it stays in the tissues and is released gradually over the two week period. Haldol, on the other hand, must be administered orally on a daily basis.

"The doctor saw Clayton again on October 5 to check his medication and also to

determine his competency to stand trial. On this second visit, Dr. Wender found Clayton much improved and determined that he was competent to stand trial, although still paranoid schizophrenic. However, the doctor said that on July 2, Clayton could not have conformed his actions to the requirements of the law, and, although docile at trial, he would again become severely psychotic if taken off his medication. The doctor echoed the other experts in testifying that paranoid schizophrenia is not curable.

"The fourth and last expert to testify at trial was Dr. John R. Hutson, a clinical psychologist and director of the Forensic Services Program, which does evaluations for the Shelby County Criminal Courts. He testified that he had seen Clayton on several occasions prior to this case and saw him again in July and October 1979. In reaching his final diagnosis, Hutson interviewed the defendant, reviewed the District Attorney's file and the medical records from the VA Hospital and the Memphis Mental Health Institute, studied Dr. Bursten's report, and went over prior records in the Forensic Services files. He reported to the court in October 1979 that Clayton was competent to stand trial but that it was 'very crucial that he be maintained on that medication to maintain his competency.' Otherwise, Hutson noted,

> ... within 3–4 months he begins to experience some significant problems with regard to his thinking, and then as a consequence his behavior begins to deteriorate as he is unable to control his thoughts and appreciate the deterioration of his thinking....

"In diagnosing Clayton as a paranoid schizophrenic, the witness noted that Clayton suffered not only hallucinations, but also delusions of grandeur and delusions of persecution. In the latter vein, Hutson described Clayton's disjointed thinking about color coding to much the same effect as Dr. Bursten's testimony.

"Dr. Hutson testified that in his opinion on July 2nd Clayton's 'ability to appreciate the wrongfulness [of his acts] was seriously deteriorated in view of his seriously disordered thinking at that time....,' and that his 'ability to conform his behavior was also impaired,' but 'probably not to the same extent because he was still able to somewhat carry himself about the city, [although] not in a very social context....' His final opinion was that Clayton was insane at the time of the offense.

"Asked about the defendant's conduct in running away from Preston Porter's body, Dr. Hutson said that someone shouting at Clayton was 'more or less like something snapping him back to reality ... [and that it] had a shock on him with regard to what was going on.'

"Moreover, Dr. Hutson concluded that the defendant dropped his knife and stepped on it to keep anyone else from using it against him. He was, Dr. Hutson said, 'trying to conceal the knife from the people who were pursuing him, because he felt that he would be harmed by it.' Normal behavior, he speculated, would have been to throw the knife away, not 'put it down and stand on it.' Dr. Hutson thought that this 'went to his ideas of being persecuted by people.'

"Against this array of overwhelming, even staggering, evidence of Clayton's insanity on the day of the offense, the State offered the testimony of three Memphis police officers, William Earl Kyles, R.D. Holder, and Sherman Chambers.

"Officer Kyles, who lived in the same apartment complex as the defendant and the victim, testified that when he got to the scene of Clayton's apprehension, Clayton 'was sitting with his head down' and 'looked okay to me.' On cross-examination, however, the officer conceded that he had had no conversation with Clayton:

> He was just sitting there. I can't make any judgment on his mental condition.

"The next officer to testify, Sgt. Holder, saw Clayton at police headquarters, advised him of his rights, and took a statement from him. Holder said that he thought Clayton 'knew he had done wrong' because:

... he did show remorse, he was sorry for it, and as he was giving the statement, you know, he got kind of teary-eyed, and he was sorry he did it—and his voice was kind of shaky ... and in my opinion he's, you know, competent.

Sgt. Holder conceded, however, that had he known of Clayton's past record of mental illness and hospitalization, he would have taken Clayton to a hospital rather than to the jail.

"Finally, Sgt. Chambers testified that he took a statement from Clayton on the following day, July 3, and that the defendant was 'clear, concise, comprehensive when he gave this statement.'"

This Court in *Graham v. State, supra,* at 543, expressly approved a set of questions for the jury that were outlined in *United States v. Smith,* 404 F.2d 720, 727 (6th Cir.1968). They are as follows:

(1) Was he suffering from a mental illness at the time of the commission of the crime?

(2) Was that illness such as to prevent his knowing the wrongfulness of his act?

(3) Was the mental illness such as to render him substantially incapable of conforming his conduct to the requirements of the law he is charged with violating?

The Court in *Smith* explained that a "negative finding as to the first question or negative findings as to both the second and third questions would require rejection of the insanity defense. An affirmative finding as to the first question, plus an affirmative finding as to either the second or third question, would require a jury verdict of 'not guilty' because of defendant's lack of criminal responsibility." 404 F.2d at 727.

■ As to the first question, the Defendant presented a compelling case of mental illness at the time of the commission of the crime. He had been diagnosed as a paranoid schizophrenia by all four of Defendant's expert witnesses. To quote Dr. Kington, "the man was grotesquely ill." The

burden of proof shifted to the State to prove, beyond a reasonable doubt, that the Defendant was sane at the time he murdered Preston Porter.

■ As to the second question, there was conflicting evidence as to whether the Defendant could comprehend the wrongfulness of his acts. All of the expert witnesses concluded that Clayton did not appreciate the wrongfulness of his act in stabbing Preston Porter. The State offered in rebuttal Sgt. Holder's testimony that the Defendant must have known "he did wrong" because he was "remorseful." Upon this evidence, a jury could be justified in finding that Clayton, at the time of the murder, could distinguish right from wrong.

■ We find the third question to be the controlling one in this case. As Judge Daughtrey forcefully stated in her dissent, the State offered no evidence whatsoever on the question of whether, at the time of the offense, the Defendant was able to conform his conduct to the requirements of the State's homicide law. The expert witnesses were all of the opinion that Clayton was not able to conform his conduct to the requirements of the law. The testimony of the police officers concerning Clayton's outward appearance, after the fact, is irrelevant to a correct determination of this issue. We find no evidence in this record which, if believed by a jury, would form the basis for the conclusion that Clayton could conform his conduct to the dictates of the law on July 2, 1979.

A similar result was reached on this identical issue in the recent case of *Stacy v. Love,* 679 F.2d 1209 (6th Cir.1982),[1] cert. denied by the United States Supreme Court on November 8, 1982, —— U.S. ——, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982), in which that Court found that:

the record is simply devoid of any evidence that Stacy had the ability to conform his conduct to the requirements of the law. Where, as here, the state bears the burden of proving the defendant sane

---

1. See, *State v. Stacy,* 601 S.W.2d 696 (Tenn. 1980), in a three-to-two decision this Court

upheld Stacy's conviction, later reversed in *Stacy v. Love, supra,* in a two-to-one decision.

beyond a reasonable doubt and fails to present any evidence which addresses an essential element of the legal test of insanity, a conviction is repugnant to due process and must be reversed.

In comparing *Stacy* with *Clayton,* the Defendant's proof of insanity in *Clayton* is much stronger, as well as the State's rebuttal proof being much weaker. The following nine factors contrast the primary differences between the two cases:

(1) *Stacy* involved a shooting murder in the perpetration of a robbery, therefore, a potential motive is money. Clayton's action in killing an innocent 12-year-old boy is without sane motivation. The State has not suggested any sane motive.

(2) Stacy immediately after fleeing the robbery and getting into his friend's car, wanted the radio on to see if any news of the shooting was being broadcast, he also looked back to see if the car was being followed, which acts show a degree of sanity not displayed by Clayton.

(3) Stacy's two companions were arrested after an automobile chase in which the driver lost control and crashed into a field. However, Stacy managed to escape the wrecked vehicle and eluded captivity for several weeks. Stacy's flight shows a higher degree of sanity than that of Clayton, who was captured within minutes after the fatal stabbing.

(4) Stacy and Clayton had prior mental hospitalization. But Stacy had a fairly short history of mental illness (a period of about one year prior to the crime), whereas Clayton's illness was of a longer duration (approximately five years) prior to the crime. Clayton was unanimously diagnosed both prior to and after the crime as suffering from a permanent condition, which could never be cured, only arrested.

(5) Both defendants could lapse into total psychosis without medication. Stacy had been without medication for less than a week, whereas Clayton had been without medication for many weeks, a period of time that all psychiatrists agree would

cause him to be completely out of touch with reality.

(6) Stacy was "highly intelligent," whereas Clayton's intelligence level is "dull normal," which makes it highly unlikely that he possessed the sophistication to fake his symptoms.

(7) A period of eight months elapsed from the time that Stacy committed the homicide before he was mentally evaluated, whereas the Defendant Clayton was evaluated by three psychiatrists within the same month of the killing.

(8) Stacy's conduct at the time of the homicide does not compare even remotely with the conduct described when he was totally psychotic or out of touch with reality. Whereas, according to all of the expert testimony presented, Clayton's acts were commensurate with those expected from someone with his condition without medication for a protracted period of time.

(9) That State put on weak expert rebuttal testimony in *Stacy.* In *Clayton,* no expert was called to testify by the State.

The evidence relating to the insanity of Clayton is far stronger than that presented with respect to Stacy. Here, as in *Stacy,* an essential element of the offense, that the defendant could conform his conduct to the requirements of the law, is missing.

In *Stacy,* the Sixth Circuit Court of Appeals was "deeply troubled by the implications of this case. Like the court below, we are acutely aware that overturning Stacy's conviction for insufficient evidence operates as an acquittal and thereby calls into effect the constitutional proscription against double jeopardy. *United States v. Burks,* 437 U.S. 1, 17–18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). Thus, granting this petition not only frees William Stacy but bars his retrial as well. This is an alarming result, for we entertain no doubt that Stacy, if left in an uncontrolled environment and without benefit of medication, remains a source of potential danger to his fellow citizens." 679 F.2d at 1212.[2]

2. Stacy was involuntarily committed to the De-   partment of Mental Health and Mental Retar-

Judge Daughtrey, in her dissent, also expresses her concerns when she states: "given a long history of violent behavior and physical injury to others, and after innumerable contracts with the mental health system, how did this obviously insane individual 'slip through'?" She responds by indicting the "mental health system as it overlaps with the State's criminal justice apparatus." She concludes by stating: "Perry Clayton is the product of what can best be described as a revolving door system of psychiatric treatment. He was a deeply psychotic individual, of proven violence, who had repeatedly displayed an inability to self-monitor a program of medication. It seems apparent that he should not have been on the streets in this condition."

We, too, are troubled by the implications of this case. The medical experts testified that Clayton cannot be cured, only treated. They stated that if a schizophrenic patient does not stay under treatment "to stay under control," he regresses downhill into a psychotic state once again, and that Clayton would become severely psychotic if taken off his medication. The experts were all in agreement that it was very crucial that Clayton be maintained on medication.

Under our ruling today, Clayton is found to be not guilty of first degree murder by reason of insanity, because no rational trier of fact could have found proof of guilt beyond a reasonable doubt. He may not be retried. See *United States v. Burks,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), in which the Supreme Court held that the double jeopardy clause of the Fifth Amendment barred a second trial where there was insufficient evidence to sustain the verdict of the jury. However, T.C.A. § 33–709 provides that when a person is found, by a jury or an appellate court, "not guilty by reason of insanity at the time of the commission of the offense, the criminal court shall order the person detained for diagnosis and evaluation ... following the diagnosis and evaluation ... the district attorney shall peti-

tion the criminal court for judicial hospitalization under the provisions of § 33–604..." Therefore, when the State fails to prove sanity, as in this case, § 33–709 will apply.

Hopefully, the failure of the system in both *Stacy* and *Clayton* has been corrected by the most recent legislative enactments in Title 33, Chapters 6 and 7. This new legislation should significantly reduce the risk that persons acquitted by reason of insanity will be prematurely released, or released without mandatory out-patient treatment. The judgments of the Criminal Court and Court of Criminal Appeals are reversed, and the case remanded to the Criminal Court of Shelby County for further proceedings pursuant to T.C.A. § 33–709.

FONES, C.J., and BROCK, J., concur.

HARBISON and COOPER, JJ., concur in separate opinion.

HARBISON, Justice, concurring.

I concur in the result reached by the majority, but, in my view, an extremely close question is presented as to whether the jury verdict should be disturbed.

This Court dealt at some length with the issue of paranoid schizophrenia in the case of *Forbes v. State,* 559 S.W.2d 318 (Tenn. 1977). There the accused had suffered from that mental illness for many years prior to the date of the crime of which he was accused. Expert testimony was unanimous that he suffered from that mental illness, but this Court upheld a jury conviction on the basis that the evidence failed to show that the accused was not in remission on the date of the crime. The Court said:

"Three inescapable conclusions emerge from the proof, i.e. (1) that a paranoid schizophrenic is not legally insane under the *M'Naghten* rules when he is in a period of remission; (2) a prima facie case of legal insanity in such a case may only be established by proof that at the time of the crime the accused was not in

dation. Over a year after the Sixth Circuit's opinion of June 3, 1982, Stacy remains confined

undergoing treatment.

remission; and (3) that proof of proper job functioning and normal appearance on the part of a paranoid schizophrenic is of questionable value." 559 S.W.2d at 325.

The Court held that a prima facie case was not shown by the record because there was insufficient evidence that on the date of the crime the accused was psychotic rather than being in a state of remission.

Viewed in light of those principles, which I think are controlling, the questions presented here are close indeed. The accused in this case had been pronounced competent to stand trial on other charges in September 1978, about ten months prior to the date of the crime in question, July 2, 1979. He was receiving injections at two-week intervals for his illness at least until January 1979. The record becomes very unsatisfactory as to whether he did or did not have much medication after that date. He was hospitalized for a gunshot wound for ten days in April and May 1979, a little over two months prior to the crime, and nothing in those hospital records mentions any deviant behavior or need of medication. His mother testified that she took him to a Veterans Administration institution a few weeks before the crime, but no records from that institution were filed in evidence.

Appellant was first examined by a psychiatrist nine days after the crime and was found at that time to be psychotic. That psychiatrist and three others testified that they were of the opinion that on the date of the crime the accused lacked mental capacity to be held responsible under the principles stated in *Graham v. State,* 547 S.W.2d 531 (Tenn.1977). The testimony of these witnesses, however, was, to say the least, contradictory and complex. At least two of these witnesses were very positive in their conclusion that the accused could not have distinguished right from wrong on the date of the crime; the other two felt that he probably could make that distinction but that he could not control his conduct so as to conform it to the requirements of law. The first two were less certain on that point and at least one of them stated that in some

degree, at least, the accused could conform his conduct.

Issues such as this generally present classic questions for determination by a jury, who are not bound to accept opinions and may reject them wholly or in part. *Edwards v. State,* 540 S.W.2d 641 (Tenn.1976).

Further, I do not believe that the trier of fact was bound to accept uncritically or at face value the very partisan and also contradictory testimony of the mother and sisters of the accused. This is an appeal from a jury verdict, and the State, not the accused, is entitled to the most favorable view of the evidentiary record. Partisan testimony of this nature, which has been rejected by a jury, ordinarily is entitled to little weight in an appellate court. Certainly the portions quoted in the majority opinion omit other evidence which was before the jury. In my view they were free to disregard in its entirety the testimony of the mother and sisters, all of whom denied any knowledge of the appellant's long history of drug abuse. Further, the mother personally drove the appellant in her automobile from her home to the streets of downtown Memphis on the night before the crime, releasing him to spend the night in a nearby "mission" where he had been staying "off and on." If she really feared he was becoming psychotic again, as she indicated, some other course of conduct would have been more appropriate, or at least a jury might so conclude.

The State made a very close issue in this case as to whether the murder resulted from mental illness or from drug abuse and drug intoxication. The accused did not testify. He gave different statements to different persons who interviewed him, but at least some of the expert witnesses were told by him that on the morning of the crime he had smoked marijuana. Records from his last hospitalization for mental illness before the date of the crime state:

"The social history reveals that he has been in trouble many times with the law, being arrested for carrying a pistol, larceny twice and for marijuana possession. Before the age of fifteen, he had been on

drugs, using Speed, acid, downers and marijuana. He also smokes marijuana off and on and drinks occasionally."

Records from a hospitalization in 1976 state:

"He gives a history of drinking a quart of beer and smoking 3 to 4 joints every day for the past 3 years."

The last question asked on cross-examination of Dr. Bursten, one of the principal witnesses for appellant, was this:

"Q. Let me ask you, Doctor, your opinion then. Wouldn't it be your opinion that the smoking of the marijuana cigarette, coupled with some mental problems he would have—would that not contribute to his actions?

"A. It could very well."

The doctor then explained that he had not obtained much history as to drug consumption by the accused, who was teetering on a "see-saw of mental balance, in, out, and so on." The doctor concluded:

"So, this certainly could have had an effect, I just don't know, I didn't get a firm enough story here to allow me to say with any certainty whether indeed it did."

There was also evidence that on the morning of the crime the accused attempted to speak to some girls on two occasions and that they rebuffed him. He went to a store, bought a butcher knife and apparently was very angry. He waited for an hour or more, then decided to kill the next person who came down the street. He stabbed a young boy to death, interrupting to straighten his knife while in the process; then fled when pursued. His flight and later his request when apprehended that he not be harmed—that he was sick—were not inconsistent with mental competency. The murder, of course, was senseless, as most homicides are, but a trier of fact could have

attributed it to anger and to drug ingestion rather than to mental illness.[1]

It seems to me, therefore, that most of the questions involved in this case were proper for submission to the jury for their determination.

Under the principles of the *Forbes* case, however, the combined effect of the expert testimony in this case—which was very strong—probably created a prima facie case that the accused was not in remission on the date of the crime. The trial judge was deeply concerned over this question when the motion for a new trial was argued, and he kept the matter under advisement for some time.

Only because the defense may have established sufficient doubt as to the mental competence of the accused on the date of the crime can I concur in setting aside the jury verdict.

COOPER, J., concurs.

1. While there is in the record evidence that the accused was of "dull normal" intelligence, this is not the most favorable evidence toward the jury verdict. There is proof that he was normal, had been a student at Shelby State Community College, and at one time had planned to study computer programming. The jurors were not bound to conclude that he was retarded or impaired as to comprehension or intelligence except when his illness was out of remission, nor is this the preponderance of the evidence, in my opinion.