**STATE of Tennessee**

v.

**Ricky THOMPSON.**

Supreme Court of Tennessee,
at Knoxville.

June 2004 Session.

Heard at Nashville.

Nov. 24, 2004.

Charles Corn, Athens, Tennessee, and Brock Mehler, Nashville, Tennessee, for the appellant, Ricky Thompson.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; Jerry N. Estes, District Attorney General; and William W. Reedy and Amy Reedy, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

WILLIAM M. BARKER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, ADOLPHO A. BIRCH, and JANICE M. HOLDER, JJ., joined.

The defendant was convicted by a jury for the 1989 first-degree premeditated murder of his wife, the aggravated assault of his wife's niece, and the arson of his home.[1] Following a bifurcated sentencing hearing, the jury sentenced the defendant to death.[2] After a hearing on the defen-

---

1. This was the defendant's second trial for these offenses. The first trial occurred in 1991 and resulted in the defendant's conviction of first-degree murder, aggravated assault, and arson. The defendant was sentenced to death for the first-degree murder. The Court of Criminal Appeals reversed the defendant's convictions because the trial court had excluded expert testimony regarding the defendant's mental state at the time of the crimes. *See State v. Ricky Thompson*, No. 03C01–9406–CR–00198, 1996 WL 30252 (Tenn.Crim.App. at Knoxville, Jan. 24, 1996), *app. denied c.r.o.*, (Tenn., July 1, 1996).

2. The jury found two aggravating circumstances: (1) that the defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder; and (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn.Code Ann. § 39–2–203(1)(3), (5) (Supp.1988). It is unclear in the record whether the defendant was ever sentenced for the aggravated assault and arson convictions.

dant's Motion for New Trial, the trial court found that the State had failed to prove the defendant's sanity beyond a reasonable doubt and modified the jury's verdict to "not guilty by reason of insanity." On appeal by the State, the Court of Criminal Appeals reversed, finding that under the standard of review of Tennessee Rule of Criminal Procedure 29,[3] the evidence was sufficient to support the jury's verdicts of guilt. The court reinstated the jury's verdicts and remanded the case to the trial court for consideration of the remaining issues in the defendant's Motion for New Trial and for sentencing on the aggravated assault and arson convictions. The defendant filed an application for permission to appeal pursuant to Tennessee Rule of Appellate Procedure 11, seeking review in this Court. We granted the application to determine (1) whether the evidence at trial was sufficient to support the jury's verdict, including its determination that the defendant was sane at the time of these offenses, and (2) whether the provision of Tennessee Code Annotated section 39–11–501(c)(effective as of July 1, 1995), which prohibits experts from testifying on the ultimate issue of whether a defendant is legally insane, applied in this trial for offenses committed in 1989. After due consideration of the relevant authority, we conclude that the evidence was sufficient to support the jury's verdict of guilt and that the prohibition of expert testimony on the ultimate issue of sanity was a substantive change to the law that should not

apply in this case. Accordingly, the judgment of the Court of Criminal Appeals is affirmed, and the case is remanded to the trial court for further consideration of the Motion for New Trial and for sentencing in the aggravated assault and arson convictions.[4]

### *Factual Background*

#### *The Events of October 25–26, 1989.*

In the days before the events in question, victim Nina Thompson confided to Vickie Lynn Estelle, her supervisor at the Jiffy convenience store in Athens, Tennessee, that she and her husband, the defendant, were having marital problems. The victim said that she was considering leaving him. On the evening of October 25, 1989, the victim asked Bryan Kevin Helms, a co-worker arriving to relieve her at the end of her shift, to cover for her if the defendant called or came looking for her. Helms agreed and did not ask any questions. The victim left with her niece, Dana Christine Rominger, and did not come home after work that night. Rominger testified at trial that after the victim had spoken to her earlier that day about the problems she was having with the defendant and expressed fear for her own safety, Rominger told her she could spend the night with her. Rominger picked up the victim after work and the women went to Rominger's father's house where they spent the night.

---

The trial court's subsequent ruling on the Motion for New Trial would have abrogated those sentences.

3. Rule 29 governs disposition of Motions for Judgment of Acquittal where "the evidence is insufficient to sustain a conviction of such offense or offenses." Tenn. R.Crim. P. 29(a).

4. We note that since the trial of this case, the trial judge, John K. Byers, has passed away.

Accordingly, consideration as thirteenth juror and of the remaining issues in the Motion for New Trial will be conducted by a successor judge. Tenn. R.Crim. P. 25(b); *see State v. Brown*, 53 S.W.3d 264, 275 (Tenn.Crim.App. 2000). If such successor judge concludes that he or she cannot perform the duty of a thirteenth juror from reading the record, the successor judge may grant a new trial. Tenn. R.Crim. P. 25(b).

The defendant spent the evening and early morning hours looking for the victim. During visits to the convenience store where the victim worked and to the victim's mother's home, the angry defendant stated that "he was ready to kill someone," that he was going "to kill that damn bitch Nina" and "kill the cops if they came to his trailer." He also threatened to "blow out" the brains of his eight-month-old son, Ricky, who was with him during his search for the victim. At one point, he purchased two gallons of kerosene or gasoline at the convenience store and showed Helms an assault rifle with a bayonet attached.

At 11:00 a.m. the following morning, the victim, Rominger, and the victim's five-year-old daughter drove to the couple's trailer and went inside. The defendant and Nina argued, and the defendant threatened to hurt the victim if she did not do what he said. The victim, her daughter, and Rominger then ran out of the trailer and got into Rominger's car, taking the eight-month-old Ricky with them. The defendant followed, carrying an assault rifle. The victim, still carrying baby Ricky, got out of the car at the defendant's direction. When Rominger began blowing the car horn and screaming for help, the defendant told her to "shut ... up" and shot her in the leg. Rominger and the victim's daughter fled across the street to a neighbor's trailer. As the victim turned to run, the defendant shot her in the back. She fell to the ground on top of baby Ricky. As the baby crawled out from under his mother's body, the defendant stood over the victim and fired several more shots as she lay on the ground. He also fired several shots into the air and into cars parked nearby. The defendant then picked up baby Ricky, went into his trailer, and set it afire. When he left the trailer, he was overheard as he walked next to the victim's body stating, "See you later," as though nothing had happened.

He then carried the baby to a store across the street, bought a soft drink, took some unidentified "powder," and waited for the police.

### Evidence of the Defendant's Mental State.

The defendant presented the expert testimony of two witnesses in support of his insanity defense. Dr. Tramontana, a clinical psychologist, opined that the defendant suffered from a mild to moderate impairment of the frontal lobe of his brain. On the day of the crime, this impairment would have affected the defendant's reasoning, his judgment, and his ability to inhibit impulsive reactions. It would also have affected the defendant's ability to focus, concentrate, plan, and organize. Such condition could be aggravated by stress or intoxication. Dr. Tramontana opined that the defendant's mental impairment could have interfered with the defendant's exercise of proper delay in judgment when provoked by circumstances such as were alleged to have occurred on the day of the crime. During cross-examination, Dr. Tramontana admitted that the Minnesota Multiphasic Personality Inventory test administered to the defendant in 1991 was invalid, possibly because the defendant had fabricated or exaggerated his symptoms.

Dr. Bernet, a psychiatrist, recounted the defendant's history of mental health problems, which included numerous hospitalizations from 1968 to 1984. Dr. Bernet testified that the defendant had an impairment to the frontal lobe of his brain as a result of chronic alcohol abuse. This impairment affected his ability to exercise self-control and curb impulsive behavior. Furthermore, the defendant suffered from a chronic psychiatric disorder called schizoaffective schizophrenia, which caused a loss of touch with reality, delusions, hallu-

cinations, and drastic mood swings. These two conditions (the frontal lobe defect and the schizophrenia), could aggravate one another. Dr. Bernet testified that the defendant's mental defects could diminish his ability to appreciate right and wrong and conform his actions to the law. He admitted, however, that the defendant's condition would come and go and that he would have "good periods" during which he could function normally. Dr. Bernet also admitted that the report he had prepared after evaluating the defendant stated that the defendant's mental deficiencies were not serious enough to support an insanity defense. This latter testimony was later stricken from the record and the jury was instructed to disregard it, after the trial court decided that such testimony was barred by the passage, in 1995, of an amendment to the insanity statute that provided that "[n]o expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a) [of that statute]."

The defense also presented the testimony of Nancy Smith, the defendant's first cousin, who testified that the defendant had been strange and out of touch with reality at times since he was a child. She also testified about the defendant's history of mental health problems, which included suicide attempts and repeated hospitalization over the years. On cross-examination, the defendant's cousin admitted that the defendant had not had any mental health problems requiring treatment from 1985 until the date of the shooting, although he continued to abuse drugs.

The State relied on the testimony of lay witnesses and cross-examination of the defendant's experts to rebut the claim of insanity. The defendant's physician, who had been treating the defendant for six months before the homicide, testified that on October 25, 1989, the day before the shooting, the defendant came to his office and appeared to be "stable." Family members, co-workers of the victim, neighbors, and others in contact with the defendant testified that although the defendant appeared somewhat withdrawn or different, they never saw anything bizarre or unusual about his behavior and that he was a good father. There was testimony that the defendant appeared agitated and angry the night before the killing, exhibiting an assault rifle and stating that he was mad enough to kill someone. He was also reported to have instructed his brother-in-law on how to feign mental illness.

After the killing, the defendant gave the police a detailed account of the shooting and showed no emotion. He did not appear to be under the influence of drugs or alcohol.

At the conclusion of the proof, the jury returned a verdict of guilt of the first-degree (premeditated) murder of Nina Thompson, the aggravated assault of Rominger, and arson. Following a bifurcated sentencing hearing, the jury sentenced the defendant to death.[5] Upon the defendant's motion for a new trial or judgment of acquittal, the trial court entered an order modifying the jury's verdicts to not guilty by reason of insanity. The court found as follows:

> At trial, the defendant presented expert testimony that he suffered from a mental disease or defect at the time of the offense which would have affected his ability to both appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law.

**5.** Although over two years lapsed between the return of the jury verdict and the hearing on the Motion for New Trial, there is no record that a sentencing hearing was held or judgment entered on the aggravated assault or arson charges.

The defense also presented lay evidence concerning the defendant's strange behavior during the time leading up to and after the offense as well as evidence of the defendant's possible consumption of both drugs and alcohol. The defendant, therefore, satisfied his burden of proof in raising a reasonable doubt as to his sanity at the time of the offense, and shifted the burden to the state to prove his sanity beyond a reasonable doubt as an element of the offense.

The state's evidence on sanity consisted entirely of cross-examination of the defendant's expert witnesses and of some lay testimony concerning the defendant's behavior leading up to the event. The state presented no expert witnesses. Although several witnesses testified for the state that the defendant was acting "normal," many of these same witnesses also testified that the defendant was "odd," "nutty," "strange," or "different." Family members of the victim testified that when the defendant was looking for the victim at 4:00 A.M. the morning before the murder, that he had threatened anyone who tried to take his child and had said he would kill them all and be out of the Moccasin Bend [Mental Health Institute] in time to piss on their graves. There was a discrepancy about when the statement was actually made and the person who testified that he heard these comments never told anyone about them until the time for retrial, about 10 years after the offense. They also testified that the defendant threatened to harm the children. Even these family members indicated that the defendant was not acting in a rational manner.

After carefully considering all the evidence, this court finds that while the record may contain some evidence on the issue of the defendant's possible sane mental state at the time of the offense, the defendant's sanity was not proven beyond a reasonable doubt as required by the law. Accordingly, this court finds that the jury's verdict should be modified to NOT GUILTY BY REASON OF INSANITY.

Additionally, this court finds that the jury may have been confused on the issue of sanity by this court's instructions to the jury about how they were to consider the testimony of Dr. Bernet. After carefully considering this in conjunction with the evidence presented, this court pursuant to Rule 33(f) would also modify the verdict as indicated above.[6]

The State appealed. In the Court of Criminal Appeals, the State raised only one issue: whether the trial court had erred in concluding that the evidence was insufficient to prove the defendant's sanity beyond a reasonable doubt. The Court of Criminal Appeals agreed that the defendant had raised a reasonable doubt as to his sanity, thus shifting the burden of proving sanity to the State. However, after carefully reviewing the expert and lay testimony regarding the defendant's actions and behavior on the day preceding and the day of the offenses, the court found the evidence legally sufficient to support the jury's verdict, including the finding of sanity beyond a reasonable doubt. In doing so, the court found it significant that no expert testified that the defendant's behavior was consistent with

6. It is less than clear from this language whether the court was acting under Tenn. R.Crim. P. 29 (judgment of acquittal) or Tenn. R.Crim. P. 33(f)(thirteenth juror rule). Since the trial court overturned the jury's verdict and declared the defendant not guilty by reason of insanity, the Court of Criminal Appeals concluded, and we agree, that the ruling fits more readily under the purview of Rule 29.

insanity; to the contrary, the descriptions of his behavior conflicted with the diagnosis. While the experts testified that his diagnosed illness would cause an inability to focus, organize, or premeditate, the description of his actions during this time period reflected a concentrated focus on finding the victim, a methodical search for her, and repeated expressions of his intent to kill anyone whom he perceived would be a threat to removing his child.

The Court of Criminal Appeals reversed the trial court's order and reinstated the jury's verdicts, remanding the case to the trial court for consideration of the remaining issues raised in the defendant's Motion for New Trial, and for sentencing on the aggravated assault and arson convictions. In reaching this conclusion, the court held that a 1995 amendment to the insanity law prohibiting experts from testifying on the ultimate issue of sanity did not apply retroactively to the defendant's case. Thus, Dr. Bernet's original testimony that the defendant was not legally insane would have been admissible. The defendant appeals, challenging the sufficiency of the evidence of sanity, and raising the question whether the Court of Criminal Appeals erred in failing to retroactively apply the 1995 amendment.

### Discussion

#### *Sufficiency of the evidence of sanity.*

■ At the time this offense was committed in October 1989, insanity was a defense to prosecution if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law. *Graham v. State,* 547 S.W.2d 531, 543 (Tenn.1977). Sanity was presumed. *State v. Flake,* 88 S.W.3d 540, 550 (Tenn. 2002); *State v. Jackson,* 890 S.W.2d 436,

440 (Tenn.1994) (citing *Brooks v. State* 489 S.W.2d 70, 72 (Tenn.Crim.App.1972)); *State v. Clayton,* 656 S.W.2d 344, 345 (Tenn.1983). If, however, the evidence raised a reasonable doubt as to the defendant's sanity, the presumption failed, and the State was required to establish beyond a reasonable doubt that the defendant both appreciated the wrongfulness of his conduct and was capable of conforming his conduct to the requirements of the law. *See Flake,* 88 S.W.3d at 550; *Jackson,* 890 S.W.2d at 440; *Clayton,* 656 S.W.2d at 345. The jury could consider both lay and expert testimony on this issue and discount expert testimony which it found conflicted with the facts of this case. *See State v. Patton,* 593 S.W.2d 913, 916 (Tenn.1979); *Edwards v. State,* 540 S.W.2d 641, 647 (Tenn.1976). The burden of proving sanity beyond a reasonable doubt could also be met by showing acts or statements of the petitioner, at or very near the time of the commission of the crime, that were consistent with sanity and inconsistent with insanity. *State v. Sparks,* 891 S.W.2d 607, 616–17 (Tenn.1995); *Jackson,* 890 S.W.2d at 440; *Edwards,* 540 S.W.2d at 646; *State v. Overbay,* 874 S.W.2d 645, 651 (Tenn. Crim.App.1993).

The defendant presented compelling testimony from both Dr. Tramontana and Dr. Bernet that he suffered from an impairment of the frontal lobe of his brain. This impairment would have affected his ability to reason, his judgment, and his ability to inhibit impulsive reactions. He also suffered from a chronic psychiatric disorder, schizo-affective schizophrenia, which caused a loss of touch with reality, delusions, hallucinations, and drastic mood swings. Dr. Bernet opined that this disorder could have affected the defendant's ability to appreciate the difference between right and wrong and prevented his ability to conform his actions to the law.

The defendant also presented lay testimony from his cousin concerning his history of mental health problems from childhood. Thus, it appears that the defendant successfully rebutted the presumption of sanity and shifted the burden to the State to prove sanity beyond a reasonable doubt.

On the other hand, the State effectively established, through cross-examination of these experts, that the defendant's illness was intermittent, and he had "good periods" when he was able to understand the concepts of right and wrong and conform his actions to the law. We find it significant that neither of the expert witnesses in this case testified unequivocally that the defendant was insane at the time of these offenses. There was also evidence that some of the psychological test results were invalid because the defendant had fabricated or exaggerated his symptoms. In addition, the State offered lay testimony which established that the defendant did not have mental health problems requiring treatment for the four years preceding the shooting. His treating physician, in fact, stated that on the day before the shooting, the defendant appeared to be "stable." Several witnesses testified that the defendant appeared agitated the night before the shooting and made threats to kill his son or to kill anyone who might try to take Ricky from him. Shortly after the shooting, the defendant showed no emotion as he recounted the details of the shooting during a police interview. All in all, we find that the cross-examination of experts and lay testimony was sufficient to meet the State's burden of proving the defendant's sanity beyond a reasonable doubt. The jury was justified in finding that at the time of these crimes, the defendant was in a "good period" and was not affected by his disorder to the extent that he was unable to distinguish right from wrong or to conform his conduct to the requirements of the law. Accordingly, we agree with the Court of Criminal Appeals that the jury's verdict should be reinstated.

### Applicability of Tenn. Code Ann. § 39–11–501(c).

■ A question arose at trial as to the applicability of the 1995 amendment to the insanity statute, which bars opinion testimony by expert witnesses on the ultimate issue of sanity. Prior to the amendment, expert witnesses were permitted to testify whether, in their opinion, a particular defendant was or was not legally insane at the time of the commission of an offense. Cohen, Sheppeard & Paine, *Tennessee Law of Evidence*, § 7.04[4] n. 400 (4th ed.2000). However, as amended, Tennessee Code Annotated section 39–11–501(c) now provides: "No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone." *See* Advisory Comm'n Comments (1996), Tenn. R. Evid. 704; *Flake*, 88 S.W.3d at 551; *State v. Perry*, 13 S.W.3d 724, 740 (Tenn.Crim.App. 1999).

During cross-examination, the State asked Dr. Bernet about a statement contained in his initial report to the effect that the defendant's mental defects were not serious enough to rise to the level of an insanity defense. The trial court permitted the question, but after further study of the applicability of the 1995 amendment, later determined that the amendment should apply to bar such opinion testimony. Accordingly, the court came back the following day and instructed the jury to disregard Dr. Bernet's testimony on this issue.

The Court of Criminal Appeals concluded that the trial court's initial ruling that Dr. Bernet's cross-examination testimony was admissible was correct, and that the

1995 amendment did not apply. The defendant argues that the change to the law was "procedural" in nature and should be applied even to cases tried under the old insanity law. The State responds that the change is substantive in nature and therefore should not be applied retroactively to cases tried under the old law. Because the trial court judge who tried this case is now deceased, and because there is the possibility of re-trial on our order of remand, we choose to address this issue.

■ Generally, statutes are presumed to apply prospectively in the absence of clear legislative intent to the contrary. *Van Tran v. State*, 66 S.W.3d 790, 797–98 (Tenn.2001); *State v. Cauthern*, 967 S.W.2d 726, 735 (Tenn.1998). In this case, the Legislature specifically provided in Section 2 of the Act[7] that the amendments to the Act applied to all offenses committed on or after July 1, 1995. There is nothing in the text of the Act or in its legislative history to indicate that the Legislature intended it be applied retrospectively. As we recently stated in *State v. Odom:* "[H]ad the legislature intended to depart from the long-established rule that statutes are presumed to apply prospectively, it could have so indicated." *Odom*, 137 S.W.3d 572, 582 (Tenn.2004). Furthermore, Tennessee Code Annotated section 39–11–112 states specifically:

> Repealed or amended laws—Application in prosecution for offense.—Whenever any penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense.

Therefore, based on clear legislative intent, we hold that the law in effect at the time the defendant committed these crimes controls whether expert testimony on the ultimate issue of sanity is admissible. Since the law at the time the defendant committed these crimes permitted expert testimony on the ultimate issue, such testimony was properly admitted and would be admissible on re-trial.

■ We also recognize that applying a statute retroactively in a criminal case may implicate constitutional prohibitions against ex post facto laws. U.S. Const. art I, § 9, cl. 3; Tenn. Const. art. I, § 11; *see also Odom*, 137 S.W.3d at 582. However, we have previously held that "courts do not decide constitutional questions unless resolution is absolutely necessary for determination of the case and the rights of the parties." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn.1995). "If issues in a case can be resolved on non-constitutional grounds, courts should avoid deciding constitutional issues." *Id.* Accordingly, as we have resolved the case before us on non-constitutional grounds, we need not address the constitutional issue.

### Conclusion

After a thorough review of the expert and lay testimony presented at trial, we conclude that the evidence was sufficient to support the jury's verdict of guilt beyond a reasonable doubt, including its determination that the defendant was sane at the time of the offenses. Furthermore, as to the admissibility of expert testimony on the ultimate issue of sanity, we conclude that the amendment of Tennessee Code Annotated section 39–11–501(c) in 1995, which operated to prohibit expert testimony on the ultimate issue of sanity, did not apply to offenses committed before the

---

7.   1995 Tenn. Pub. Acts, ch. 494.

amendment's effective date of July 1, 1995. Accordingly, the judgment of the Court of Criminal Appeals is affirmed, and the case is remanded to the trial court for further consideration of the Motion for New Trial and sentencing for the aggravated assault and arson convictions.

It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.