IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 26, 2009

## STATE OF TENNESSEE v. DAVID LYNN HARRISON

**Appeal from the Criminal Court for Knox County**
**No. 80637     Kenneth F. Irvine, Jr., Judge**

_____

**No. E2008-01082-CCA-R3-CD - Filed August 17, 2010**

_____

The Defendant, David Lynn Harrison, appeals from his conviction by a jury in the Knox County Criminal Court for theft of property valued at $1,000 or more, a Class D felony, for which he was sentenced as a Range I, standard offender to three years in the Department of Correction. The Defendant contends (1) that the evidence is insufficient to support his conviction, (2) that the trial court erred when it failed to instruct the jury on the lesser included offenses of unauthorized use of a vehicle and attempted theft, and (3) that the trial court committed plain error when it failed to instruct the jury on the defenses of duress and necessity. Because the trial court erred in failing to instruct the jury on the lesser included offense of unauthorized use of a vehicle, we reverse the judgment of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**;
**Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Donna Robinson Miller (on appeal); Mark E. Stephens, District Public Defender, and Robert C. Edwards and Greg Burlison, Assistant Public Defenders (at trial), for the appellant, David Lynn Harrison.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Phillip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case concerns the taking of a Roto-Rooter van. At the trial, Ricky Hunt, the owner of the Knoxville Roto-Rooter franchise, testified that the business's six or seven vans and heavy equipment were kept within a locked and secured fenced area. He said that the technicians were supplied with service vans equipped with drain machines and other equipment but that the company did not supply hand tools. He stated that the technicians, including the Defendant, supplied their own hand tools, which they kept on the vans they drove. He explained that the technicians would arrive in the morning, determine their schedules, and retrieve their vans. He said that the technicians were assigned vans and that they kept their keys with them when they left the premises. He also said that because Roto-Rooter was a 24-hour service, the "on call" technician would take a van home.

Mr. Hunt testified that when he hired the Defendant, he explained that he would terminate the Defendant "on the spot" if he caught the Defendant engaging in "side work." He explained that side work occurred when a Roto-Rooter technician responded to a call but told the customer that he or she would return after business hours and do the work for less money. He said this created a potential liability for his company. He said that on February 27, 2004, a customer called to complain of a problem about a job on which Defendant had worked. He said that he sent another technician, Trevor Hamlin, to correct the problem and that Hamlin called him with concerns and asked him to speak to the customer. He said he spoke with the customer and determined that the Defendant's employment had to be terminated for engaging in side work. He said he made the decision at approximately 4:00 p.m. or 5:00 p.m., while the Defendant was working on another job. He said he waited until the Defendant finished the job, at about 8:30 p.m., and called the Defendant into his office. He said that he produced an invoice showing that the Defendant had scratched out Roto-Rooter's price and had lowered the price to reflect the amount of money the customer had paid to the Defendant. He said he told the Defendant that he could not have a dishonest person working for him. He said the Defendant agreed that he had engaged in side work and apologized.

Mr. Hunt testified he told the Defendant that the Defendant could bring his personal car inside the fenced area to unload the Defendant's tools from the van. He said the Defendant left the office but instead of going to get his personal vehicle, the Defendant went into the fenced area. Mr. Hunt said he thought the Defendant's action was unusual because the average plumber could not carry all his tools. He said he waited about five minutes before sending an employee to make sure that the Defendant took only his personal equipment and not the company's equipment. He said that after another five minutes, he asked another technician, Mark Harper, to tell the Defendant to "get a move-on" because he was "not going to wait all night for [the Defendant] to get his tools together." He said that

-2-

it was about 9:15 or 9:20 at night and that it was past time to close the shop. He said that he followed Harper out of the office to the corner of the building and saw a van back out but that he could not tell at the time who was driving. He said he positioned himself at the fenced area's exit in order that the van would have to stop. He said that the van stopped and that he saw the Defendant was driving. He said he told the Defendant, "Hey, stop," and then he asked, "David, what are you doing in my van? You're terminated, you have no right to be in my van." He said he was concerned about the liability for his company if a person who was not an employee drove a company van and caused an accident. He said the Defendant replied, "Look, I'm leaving." He said that he told the Defendant to return the van or that he would call the police and report the van stolen. He said the Defendant replied, "Do what you got to do." He said that the Defendant gunned the engine and that he jumped out of the way to avoid being hit. He said that the van went over the curb and that he screamed to his secretary to call the police.

Mr. Hunt testified that two other technicians got into a van and followed the Defendant. He said another technician, Trevor Hamlin, got into his personal vehicle and followed, as well. He said that the value of the van and the equipment was between $8,000 and $10,000 but that the equipment was more valuable than the van. He said that once he learned the van had been recovered, he went home. He said that the Defendant's personal vehicle remained on his property.

On cross-examination, Mr. Hunt testified that on the day the Defendant was hired, the Defendant was not allowed to take a Roto-Rooter van home in order to load tools into it. He said he was positive that the Defendant brought his tools to the business in the Defendant's truck. He did not agree that it was unusual for other technicians to be at the shop as late as they were on the night of the theft, and he said it was common for other technicians to be at the office late to turn in their vans. He said he did not ask for the Defendant's keys when he terminated the Defendant's employment because he told the Defendant he could bring his personal vehicle inside the fenced area to load his tools from the van. He said that the Defendant could not have misunderstood his instruction nor believed that he gave permission to take the van outside the fenced area to the Defendant's personal vehicle. He acknowledged that after the Defendant left in the van, he had a conversation with the Defendant over a two-way radio. He said that he asked the Defendant why he took the van and that the Defendant replied that he worked hard. He said the Defendant also stated, "if Trevor [Hamlin] continue [sic] to follow me, when I get to my house, I'm going to shoot him." He said he sent a message to Hamlin's pager instructing him not to follow the Defendant home.

Mr. Hunt testified that after the Defendant had been arrested, he instructed a technician who was a friend of the Defendant to ask the Defendant when the Defendant wanted to retrieve his tools. He said he wanted to arrange to have a law enforcement officer

present. He said he did not hear from the Defendant until about two weeks after the theft, when he received a letter from a lawyer stating that the Defendant wanted his tools. He said that the Defendant was allowed to retrieve his tools. He said that on the night of the theft, he had four technicians returning their vans and that he employed a total of six or seven technicians at that time. He said that Trevor Hamlin and Mark Harper started work about 8:00 a.m. He said that another technician, Chris Armitage, reported to work at 3:00 p.m. He said it was not uncommon for technicians to work as much as fifteen hours a day because the company was an around-the-clock service business.

Trevor Hamlin testified that he was employed by Roto-Rooter in February 2004. He said that he was at the shop when the Defendant's employment was terminated and that he waited to leave because he "just wanted to see what was going to happen." He said that when the Defendant came into the shop, the Defendant and Hunt talked for ten to fifteen minutes, and then Hunt asked another employee to accompany the Defendant to the van to retrieve the Defendant's tools. He said Hunt later asked Mark Harper to go to the van and tell the Defendant he had only fifteen more minutes to empty it. He said he accompanied Harper and saw the Defendant back out the van. He said the van nearly struck them as it pulled into the garage, through which the Defendant had to drive to leave the property. He confirmed that Hunt stood in front of the van, that he heard the Defendant tell Hunt to do what he had to do, and that the Defendant "took off" over the curb and out the garage. He said that he ran to his car and followed the Defendant. He said the Defendant did not speed or break any laws at that point. He said that when the Defendant stopped at a traffic light, he put his car in park, got out, and walked up to the van's driver's side door. He said that he tried opening the door but that the Defendant had locked it. He said that the window was open, that he reached in to retrieve the keys, that the Defendant hit him in the jaw, and that he fell backwards. He said the Defendant then made a right turn from the left lane. He said he returned to his car and followed the Defendant until the Defendant was stopped by the police. He said that while he was following the Defendant, he received three electronic pages from the shop, one of which told him that the Defendant had threatened to shoot him if he stepped onto the Defendant's property. He said that he turned on his emergency lights but that he did not try to run the Defendant off the road.

On cross-examination, Mr. Hamlin testified that he finished work at 6:00 the night of the theft and that he and Hunt discussed the work he had performed at the last customer's house. He said they also discussed what the customer had said and what Mr. Hamlin had seen. He said that Hunt did not ask him to stay until the Defendant arrived. He said he was not asked to follow the Defendant when the Defendant took the van. He agreed that the Defendant maintained a safe rate of speed, and he said that the Defendant drove a little slower than the flow of traffic but did not put anyone on the road in danger. He said he did not tell an insurance agent about the pager message from Hunt informing him that the

Defendant had threatened to shoot him because the agent did not ask about it and because he did not remember to tell her about it.

Mark Harper testified that he had been employed by Roto-Rooter since 2003 and that he had served as a reserve sergeant with the Knox County Sheriff's Department since 1993. He said that when he returned to the shop after making a service call on the night of February 27, 2004, Hunt asked him to stay because Hunt was going to terminate another technician's employment and wanted him there to observe in case there were any incidents. He said that the Defendant went into Hunt's office and that when the Defendant came out, he watched the Defendant walk to his work van. He said the Defendant's personal vehicle was parked outside the fenced area in the employee parking area. He said Hunt later asked him to follow the Defendant to the van to make sure the Defendant did not take any company equipment. He said that as he and Trevor Hamlin walked toward the company vans, he saw the Defendant get into his van. He said that as the Defendant drove by, the Defendant looked flustered. He said he saw the Defendant stop the van by Hunt and heard Hunt tell the Defendant to take the van back to the company lot. He said he observed the van's kicking gravel up and accelerating and Hunt's stepping out of the way before the van drove over the curb and onto the street.

Mr. Harper testified that he heard Hunt yell that the Defendant was stealing the van. He said that as a sworn officer who had just witnessed a theft, he told Hunt he would call dispatch, and then he and Chris Armitage followed the Defendant in another van. He said that he saw Trevor Hamlin's car follow the Defendant and that he directed Armitage to go the other direction in case the Defendant circled the block and returned to the shop. He said that after they reached the main road, he observed Hamlin on foot, running back to Hamlin's car. He said that he called dispatch and followed the Defendant to Sevier Avenue, where the Knoxville Police Department and the Knox County Sheriff's Office had stopped the van. He said the distance from the Roto-Rooter company to the point where the Defendant was stopped by law enforcement was approximately twenty miles. He said the Defendant drove in the center lane, slower than the flow of traffic.

On cross-examination, Mr. Harper testified that technicians were allowed to drive their personal vehicles into the fenced company lot in order to load tools into their personal vehicles. He said, however, that they were never allowed to do it "the other way around." He said that the Defendant could have turned either direction after leaving the garage and that it would have been possible for the Defendant to drive the van around to the other side of the fence. He agreed that the Defendant did not commit any traffic violations and that as a part-time sheriff's deputy, he felt comfortable making that determination. He did not see whether the Defendant attempted to flee on foot after he was stopped by law enforcement.

On redirect examination, Mr. Harper testified that the company policy provided that if an employee were terminated from work, the employee would bring his or her vehicle into the fenced company lot to unload his personal tools. He agreed that the Defendant could have driven the company van to the Defendant's personal vehicle, but he said that the Defendant did not. On recross-examination, Mr. Harper testified that Hunt's demeanor on the night of the theft was solemn but normal.

The Defendant testified that he was hired by Roto-Rooter as an independent contractor, which meant that he had to provide his own tools and purchase all the gasoline for the van. He said that he was paid only for the work he did and not by the hour. He said that he had accumulated between $5,000 and $10,000 worth of tools over a twenty-year period and that all his tools were in the van. He said that he was allowed to take the van home on the day he was hired, which was a Friday, and that he kept it over the weekend to load it with his tools. He said that when he received the van, it was equipped with only three drain cleaning machines. He said he was allowed to take the van home more times than not because he tried to take as many service calls as possible. He said that Hunt once asked him to wait at the shop for service calls but that he told Hunt that as long as he paid for the fuel, he could take the van where he wanted.

The Defendant testified that on the day he was charged with stealing the van, he began work at about 7:45 a.m. He said he drove to the Roto-Rooter lot in his personal vehicle, a 1998 Ford Explorer. He said he worked more than thirteen hours that day before he received a call from Hunt telling him to come to the shop. He said that he arrived between 9:00 p.m. and 10:00 p.m. and that all the plumbers were there, which was unusual, especially because it was a Friday night. He said he parked the company van at the shop's door, not in the fenced lot. He said that Hunt presented him with a sheet of paper that had his name and telephone number on it, but he said the paper was not an invoice. He said Hunt told him that he was not allowed to do side work. He said he admitted to doing a few side jobs, for about twenty dollars each, to cover the cost of gasoline. He said that he was hurt because he had just performed a $1,500 job for Hunt, that he had a check for that amount made payable to Roto-Rooter, and that he was supposed to receive part of that payment. He said that Hunt told him to pull his van to the fenced lot, which he did.

The Defendant testified that as he walked toward the rear of the van, Harper, Hamlin, and another employee approached him and told him he had a certain number of minutes to get his tools and to get off the property. He said that Harper was known to carry a gun at all times and had bragged about it. He said that it was late, that it was dark, that he was in the back lot, and that three men were coming toward him. He said he sensed an altercation and got back into the van to avoid it. He said he drove the van through the shop's garage and stopped to talk to Hunt. He said that Hunt approached the van from the side and that he told

Hunt, "Pull your men off." He said that Hunt turned, ran to his truck, jerked open the driver's door, and reached under the seat. He said that a few days before, Hunt had said, "If anybody crosses me, I'll get my pipe wrench out of my truck and I will use it on them." He said that he thought Hunt was reaching for the pipe wrench and that he drove away to avoid "a situation."

The Defendant testified that all the vans had to drive off the curb to leave the shop. He said that when he reached the stop sign, he realized that people were pursuing him. He said Hamlin made aggressive moves toward him by reaching and grabbing through the open window of the van. He said that he thought he could get back to his Explorer and that if he were really going to steal the van, he could have driven onto the Interstate at that moment. He said that he turned onto Lovell Road from Dutchtown Road and that he made a right onto Murdock Road to try to return to his Explorer. He said that he spoke to Hunt on the two-way radio, that he asked Hunt to calm down, and that he told Hunt he was going to take his tools home. He said that when he turned onto Murdock, Hunt said, "I got you now, sucker. I got you now." The Defendant said he went straight onto Pellissippi Parkway, I-140, toward I-40/75 and then took I-40/75 through downtown Knoxville and exited onto James White Parkway. He said he turned onto Moody Avenue, which connects with Old Sevierville Pike, where he was stopped by the police.

When asked why he did not return to the lot, the Defendant responded that Hunt cut off communication, that he was being pursued, and that he did not want to get into a fight. He said that he felt very threatened and scared. He said that when he turned onto Moody Avenue, about one and one-half miles from his home, he saw blue lights behind him and waited at the stop light for the police because he hoped they would help him. He said that instead, he was placed under arrest. He said he did not speed or drive in a reckless manner. He said he did not handle stress well and wished the other technicians would have stopped following him. He said he did not know their intentions. He said that after he was arrested, he asked Harper to take his tools home. He said that after he made bail, he retrieved his Explorer, which was worth about $15,900.

The Defendant testified that he obtained a lawyer to help him retrieve his tools, which were necessary for his livelihood. He said that about two weeks later, he was able to get his tools from the Roto-Rooter lot. He said that two police officers were present and that it took him over an hour and a half to load everything that would fit into the Explorer. He said that he did not have room for a sink and a toilet and that he left those items behind.

The Defendant testified that he wished he had thought to go directly to the police department but that he was more concerned about the men following him. He said he felt he

had a right to drive the van home because Hunt had let him take the van home previously and because he had paid for the gasoline.

On cross-examination, the Defendant testified that he had worked for Roto-Rooter before the employment relevant to this case. He denied that he had been fired during his previous employment for doing side work. He admitted that there had been "an incident" with an unhappy customer, but he said that his employment had not been terminated. He said that Hunt fired him on the occasion at issue for leaving his name and phone number on a piece of paper for a future job. He said that the testimony about an invoice was incorrect and that Hunt lied about having an invoice. He said he knew that leaving his contact information was grounds for termination. He agreed that Hunt had the right to terminate his employment.

The Defendant testified that the other witnesses were wrong about where he parked the van when he arrived at the shop on February 27. He said he first parked in the main parking lot. When asked if Hunt was aggressive, the Defendant replied that "Hunt was looking to make an example of someone." He said it was an unpleasant situation, and he admitted that he did not handle stress well. He also admitted that Hunt told him to drive his personal vehicle to the fenced lot to retrieve his tools from the van. He said that he complied until the three technicians approached "in an aggressive manner." He said that their statement, "You've got so many minutes to get your stuff and get off this property," was aggressive. He said that the men did not touch him, except Hamlin, who tried to assault him while they were in the fenced lot. He said that Hamlin's reaching and grabbing at him and that the technicians' pursuits were physical and verbal assaults. He said that Hunt did not tell him to stop or threaten to call the police. He said that he did not have to stop if he did not choose to stop. He agreed that he did not have title to the van and that the van belonged to Roto-Rooter. He said that when Hunt jerked open the truck's door, he knew he "had to go." He agreed it was not appropriate for him to drive the van after he had been fired, but he said he did it to avoid an altercation and because he was afraid.

The Defendant testified that he did not tell Hunt he would shoot Hamlin if Hamlin came to his house. He admitted he kept a gun at home. He said his first concern was for his safety and his second concern was for his tools. He said he initially circled back to his Explorer, hoping he could convince Hunt to stop the pursuit. He said if the other technicians had not been there, he would have been able to get his tools. He said that he knew he did not have permission to drive the van and that he drove it anyway.

On redirect examination, the Defendant testified that he was assigned to a particular van. He said that he felt it was his van and that he had taken it to his house. He said he felt entitled to drive the van because he paid for the gasoline in it. He said that his relationship with Hunt was contractual but that Hunt did not uphold his part of the agreement by refusing

to let him take the van home to unload it, which Hunt had allowed him to do when he had been hired. He said the situation was like a snowball and that it just kept getting larger. He said that in his opinion, Hamlin's actions amounted to a physical assault. He said that he wanted to avoid violence and that he felt that taking the van was his only choice.

On recross-examination, when asked to confirm that he took someone else's van which contained $10,000 worth of tools but that he left behind his $15,000 vehicle, he replied that the van was "junk." He said that his actions were for self-preservation because he did not want to be hurt. On redirect examination, the Defendant testified that he never thought anything would happen to his Explorer when he left it in the employee parking lot at Roto-Rooter.

In rebuttal, Rick Hunt testified that he never threatened employees with pipe wrenches. He said he would not have any employees if he acted that way. He said that in regard to a letter he received from the Defendant's attorney, which alleged that his employees had verbally and physically abused the Defendant, he responded that no one had threatened or physically assaulted the Defendant on his property. He said that their conversation was civil when he terminated the Defendant's employment and that the Defendant admitted he had made a mistake. He said the Defendant did not press charges or sue him. He said that he was a master plumber and that the greatest possible value of the hand tools the technicians carried was approximately $3,000. He said he arranged for sheriff's deputies to be present when the Defendant returned to retrieve his tools. He said that the Defendant could have unloaded his personal tools in about twenty minutes but that he unloaded all the equipment in the van before he took his tools, requiring the Roto-Rooter technicians to reload the van later.

Mr. Hunt testified that on the night of the theft, he would have given the Defendant as much time as needed to unload the van. He said he told the Defendant that he was not going to wait all night because the Defendant was just sitting in the van and not making any attempt to unload it. He said that the Defendant was not on call that night and that he did not recall any time that the Defendant had been the on-call technician. He recalled that he did not receive the customer's $1,500 check from the Defendant that night and that the customer had to stop payment and issue another one. He said the Defendant was paid for his work. He said that he never told the Defendant "I got you now sucker," because the Defendant did not turn on the two-way radio until the Defendant called to say he would shoot Hamlin.

On cross-examination, Mr. Hunt testified that his employees could not perform their jobs as plumbers without their tools. He said that the Defendant did not tell him he was going to steal the van. He agreed that the Defendant said he was going home.

The jury found the Defendant guilty of theft of property valued at over $1,000. The trial court sentenced the Defendant as a Range I, standard offender to three years' confinement.

## I

The Defendant contends that the evidence is insufficient to support his conviction for theft of property of $1,000 or more because he lacked the intent to deprive his employer permanently of the van. The State contends that the evidence is sufficient to support the Defendant's conviction for theft because the Defendant took the van despite the employer's express order to return the van and because the Defendant relinquished control of the van only when stopped by law enforcement. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but we must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Tennessee Code Annotated section 39-14-103 states, "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2003). The Code defines "deprive" in pertinent part as to:

> (A) Withhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner; . . . .

T.C.A. § 39-11-106(a)(8)(A).

We conclude that the evidence is sufficient to sustain the Defendant's conviction for theft. The Defendant admitted that he did not own the Roto-Rooter van, that he took the van without the owner's consent, that the owner tried to stop him, and that he took the van anyway. The Defendant's argument that the evidence is insufficient to sustain his conviction because he did not intend to deprive the owner permanently of his property must fail. Code section 39-11-106 states that to "deprive" means to "withhold property from the owner

-10-

permanently <u>or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner.</u>" T.C.A. § 39-11-106(a)(8)(A) (emphasis added). At the trial, the Defendant stated that he intended to take the van to his home, despite the owner's express instruction to return the van to the fenced lot. The owner was substantially deprived of his property because the van was not recovered until after the Defendant was stopped and arrested, twenty-miles from the Roto-Rooter facility.

The Defendant cites <u>State v. Buttrey</u>, 756 S.W.2d 718 (Tenn. Crim. App. 1988), and <u>State v. McAfee</u>, 737 S.W.2d 304 (Tenn. Crim. App. 1987), for the proposition that the conviction rests on purely circumstantial evidence and that the jury did not exclude every other reasonable hypothesis. <u>See, e.g.</u>, <u>State v. Crawford</u>, 470 S.W.2d 610, 612 (Tenn. 1971) (holding that when a conviction rests solely on circumstantial evidence, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant"). In this case, however, the Defendant's conviction does not rest exclusively on circumstantial evidence. The eyewitnesses' testimony and the Defendant's own testimony are direct evidence of the Defendant's conduct. The jury in this case was not obligated to exclude every other reasonable hypothesis before finding the Defendant guilty of theft. Moreover, the standard of appellate review for determining sufficiency of the evidence is the same "whether the conviction is based upon direct or circumstantial evidence." <u>State v. Sutton</u>, 166 S.W.3d 686, 689 (Tenn. 2005). Based upon the record, a rational trier of fact could have found the essential elements of theft beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

## II

The Defendant contends that the trial court erred in failing to instruct the jury on the lesser included offenses of unauthorized use of a vehicle and attempted theft. The State contends that the Defendant has waived this issue because he failed to file a written request for an instruction on a lesser included offense and that the trial court's failure to instruct jury on lesser included offenses was not plain error.

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. <u>See</u> <u>State v. Harris</u>, 839 S.W.2d 54, 73 (Tenn. 1992) (citing <u>State v. Thompson</u>, 519 S.W. 2d 789, 792 (Tenn. 1975)). Anything short of a complete charge denies the defendant his constitutional right to a trial by jury. <u>See</u> <u>State v. McAfee</u>, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987).

Because the law regarding determining lesser included offenses has changed since the trial, we must determine which law applies in our review and which law will apply upon remand of the case. In 1999, in <u>State v. Burns</u>, our supreme court held that the Model Penal

Code approach for determining lesser included offenses was "consistent with the structure of our own criminal code." The court established the following test for determining whether an offense is a lesser included offense:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>
>> (1) a different mental state indicating a lesser kind of culpability; and/or
>>
>> (2) a less serious harm or risk of harm to the same person, property or public interest; or
>
> (c) it consists of
>
>> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>>
>> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>>
>> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

State v. Burns, 6 S.W.3d 453, 466-67 (Tenn.1999).

In July 2009, the Tennessee General Assembly amended Tennessee Code Annotated section 40-18-110 by adding subsections (f) and (g). Subsection (f) defines lesser included offenses as those in which all the statutory elements "are included within the statutory elements of the offense charged[.]" 2009 Tenn. Pub. Acts 439; T.C.A. § 40-18-110(f) (Supp. 2009). Subsection (g) defines which offenses are to be considered lesser included offenses of other offenses. See T.C.A. § 40-18-110(g) (Supp. 2009). The act stated, "This act shall take effect July 1, 2009, . . . ."

-12-

"[S]tatutes are presumed to apply prospectively in the absence of clear legislative intent to the contrary." State v. Thompson, 151 S.W.3d 434, 442 (Tenn. 2004) (citing Van Tran v. State, 66 S.W.3d 790, 797-98 (Tenn. 2001); State v. Cauthern, 967 S.W.2d 726, 735 (Tenn. 1998)). If the legislature intended the amendment to apply retroactively, it could have stated so. See State v. Odom 137 S.W.3d 572, 582 (Tenn. 2004). We note that the legislature had plainly stated that a 2001 amendment to the statute applied to trials conducted on or after January 1, 2002. See 2001 Tenn. Pub. Acts 338, § 2. In contrast, the legislature stated that the amendment at issue was to take effect on July 1, 2009. Because no legislative intent to the contrary is shown, we presume that the amended sections (f) and (g) apply to offenses committed on or after July 1, 2009. We also note that when a penal statute is amended by a subsequent legislative act, an offense committed before the amendment "shall be prosecuted under the statute in effect at the time of the commission of the offense." T.C.A. § 39-11-112 (2006). We conclude that the issue of whether the trial court properly instructed the jury on lesser included offenses should be evaluated under Tennessee Code Annotated section 40-18-110 as it existed at the time the Defendant committed the offense.

The Tennessee Supreme Court's role is "to ascertain and effectuate the legislature's intent." State v. Wilson, 132 S.W.3d 340, 341 (Tenn. 2004). Until July 1, 2009, the law regarding lesser included offenses applicable to the Defendant's trial was the Tennessee Supreme Court's interpretation of 40-18-110 as outlined in Burns. Therefore, we apply the Burns test to the Defendant's appeal.

If a court determines that an offense is a lesser included offense under Burns, then the trial court must conduct the following two-step analysis in order to determine whether the lesser included offense instruction should be given:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469. If a trial court improperly omits a lesser included offense instruction, then constitutional harmless error analysis applies, and the State must show that the error did not affect the outcome of the trial beyond a reasonable doubt. State v. Ely, 48 S.W.3d 710, 725 (Tenn. 2001). "In making this determination, a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory

of defense, and the verdict returned by the jury." State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002).

A defendant waives the instruction of a lesser included offense if he or she does not make a written request for one. T.C.A. § 40-18-110(c). If a defendant does not make a written request for an instruction, he or she may not present the trial court's failure to instruct the jury on a lesser included offense as a ground for relief in a motion for new trial or on appeal. Id. However, an appellate court may review the trial court's instructions to determine whether the court committed plain error by failing to instruct on a lesser included offense. State v. Wilson, 211 S.W.3d 714, 720-21 (Tenn. 2007); State v. Page, 184 S.W.3d 223, 229-30 (Tenn. 2006).

This court may review the record for plain error "that has affected the substantial rights of a party" when "necessary to do substantial justice." T.R.A.P. 36(b). Our supreme court has adopted the factors developed by this court to be considered

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established before an appellate court can recognize plain error, but our consideration of all the factors is unnecessary where the record reflects that at least one of the factors cannot be established. Id. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

The record reflects that defense counsel announced his intention to file a written request with the trial court asking it to instruct the jury on the lesser included offense of unauthorized use of a vehicle. However, the trial court immediately denied the request and explained that the Defendant was indicted not only for theft of a vehicle, but also for theft of the tools, service equipment, and other items belonging to Roto-Rooter. The trial court stated that if the theft involved only the van, it believed the Defendant would be entitled to

-14-

the instruction. The court compared the Defendant's circumstances to those of the defendant in State v. Brooks, 909 S.W.2d 854 (Tenn. Crim. App. 1995), which held that a defendant was entitled to have the jury instructed on theft and unauthorized use of a vehicle where the defendant was intoxicated and the element of his intent was in question. The trial court stated:

> [T]he only difference between the theft [in Brooks] – the felony theft charge that they were dealing with and the misdemeanor charge [of unauthorized use of a vehicle] is the element of mens rea. Here we have the . . . difference of . . . the other item[s] that are charged as part of this theft charge. So, I think it is distinguishable. If it had been for just the theft of this van, that you would have been entitled to this instruction. So, I'm going to find that it's not an appropriate lesser included [offense] and deny your request.

The trial court instructed the jury only about the offense of theft.

The offense of unauthorized use of a vehicle, also referred to as "joyriding," occurs when a person "takes another's automobile, airplane, motorcycle, bicycle, boat or other vehicle without the consent of the owner and the person does not have the intent to deprive the owner thereof." T.C.A. § 39-14-106. This court has recognized that unauthorized use of a vehicle is a lesser included offense of theft of a vehicle because it satisfies part (b) of the Burns test. See State v. David Michael Gamble, No. 03C01-9812-CR-00442, Hamilton County (Tenn. Crim. App. Jan. 21, 2000).

In David Michael Gamble, this court held that the defendant was entitled to a jury instruction for unauthorized use of an vehicle when he was charged with theft of a tractor trailer rig and its contents. Id., slip op. at 1. The indictment in Gamble alleged in pertinent part that "the Defendant did unlawfully and knowingly obtain or exercise control over a 1990 Freightline tractor, trailer and sixty-five (65) assorted pieces of La-Z-Boy furniture, valued at over $60,000.00, belonging to Volunteer Trucking without the owner's effective consent and with the intent to deprive the owner of said property . . . ." Id., slip op. at 7. In the present case, the indictment alleged that the Defendant

> did unlawfully and knowingly obtain and exercise control over . . . [a] motor vehicle, service equipment, tools and other items . . . of the value of at least One Thousand and 00/100 ($1,000.00) Dollars but less than Ten Thousand and 00/100 ($10,000.00) Dollars, of Roto-Rooter without their effective

> consent, with intent to deprive the said Roto-Rooter thereof . .
> . .

The circumstances of this case are analogous to those in <u>David Michael Gamble</u> because the Defendant was charged with a single count of theft which pertained to the vehicle and its contents, not with multiple counts of theft concerning every item taken. The difference in the theft of the vehicle offense and the unauthorized use of a vehicle offense is the mental element, and we conclude that the trial court committed plain error in not instructing the jury on the lesser included offense of unauthorized use of a vehicle. <u>See</u> <u>Burns</u>, 6 S.W.3d at 453; <u>State v. Smith</u>, 24 S.W.3d at 282 (holding that plain error requires, among other things, that "a clear and unequivocal rule of law must have been breached").

Because the court was required to instruct the jury on the lesser included offense of unauthorized use of a vehicle, we must determine whether this error did not affect the outcome of the trial beyond a reasonable doubt. <u>See</u> <u>State v. Page</u>, 184 S.W.3d 223, 230 (Tenn. 2006) (holding that failure to give an instruction on a lesser included offense that is supported by the evidence is a non-structural constitutional error). When a trial court instructs the jury on the offense charged but does not instruct the jury on any lesser included offenses, the appellate court must examine the record and determine "whether a reasonable jury <u>would</u> have convicted the defendant of the lesser-included offense instead of the charged offense." <u>State v. Richmond</u>, 90 S.W.3d 658, 662 (Tenn. 2002); <u>see also</u> <u>Burns</u>, 6 S.W.3d at 469. "If no reasonable jury would have convicted the defendant of the uncharged lesser-included offense rather than the offense for which the defendant was convicted, then the failure to charge is harmless beyond a reasonable doubt." <u>State v. Banks</u>, 271 S.W.3d 90, 126 (Tenn. 2008) (citing <u>State v. Locke</u>, 90 S.W.3d 663, 675 (Tenn. 2002)).

After reviewing the record, we cannot conclude that the trial court's failure to instruct the jury on the lesser included offense of unauthorized use of a vehicle was harmless beyond a reasonable doubt. The Defendant testified that he wanted to ensure his safety and that he wanted to retrieve his tools. His apparent destination when he took the Roto-Rooter van was his home, and he testified that he intended to deposit his tools there. The Defendant hired a lawyer to facilitate the retrieval of his tools. He left his personal vehicle in the company's employee lot and returned later to get it. Because the Defendant's intent was in question, a reasonable jury could have convicted the Defendant of the offense of unauthorized use of a vehicle.

Regarding the Defendant's contention that the trial court erred in failing to instruct the jury on the lesser included offense of attempted theft, he argues that the theft was never completed because he was arrested by the police before he could "deprive the company owner of the van." The State concedes that attempted theft is a lesser included offense of

theft under part (c) of the <u>Burns</u> test. However, the record is devoid of any request for an instruction concerning the lesser included offense of attempted theft. Thus, the Defendant is limited to plain error review.

Tennessee Code Annotated section 39-12-101 defines criminal attempt as:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> > (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> >
> > (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> >
> > (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

The Sentencing Commission Comments to this section note that the offense of criminal attempt is

> directed at the individual whose intent is to commit an offense, but whose actions, while strongly corroborative of criminal intent, fail to achieve the criminal objective intended.

Our supreme court has held that "where the evidence clearly establishes the completion of the crime, it is unnecessary for the trial court to charge the jury as to attempt or solicitation." <u>State v. Banks</u>, 271 S.W.3d 90, 127 (Tenn. 2008) (citing <u>State v. Robinson</u>, 146 S.W.3d 469, 487 n.7 (Tenn. 2004)).

The Defendant did not attempt to take the van but fail to accomplish his objective. By his own admission, the Defendant completed the offense when he took the van without

the owner's consent. We conclude that the trial court was not required to instruct the jury on the lesser included offense of attempted theft and that no clear and unequivocal rule of law has been breached with regard to the jury instruction about attempted theft. However, the trial court erred when it failed to instruct the jury on the lesser included offense of unauthorized use of a vehicle, and the Defendant is entitled to a new trial with the proper jury instruction.

### III

The Defendant contends that the trial court erred when it failed to instruct the jury on the defenses of duress and necessity and that this failure constitutes plain error. The State contends that the Defendant has waived this issue and that the trial court's failure to instruct the jury about those defenses does not constitute plain error.

As we noted, the trial court must give a complete charge of all of the law that applies to the facts of the case. See Harris, 839 S.W.2d at 73 (citing Thompson, 519 S.W.2d at 792). The defendant also "has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." Thompson, 519 S.W.2d at 792; see T.C.A. § 39-11-203(c), (d) (2006) (entitling a defendant to have the issue of the existence of a defense submitted to the jury when it is fairly raised by the proof). An erroneous jury instruction deprives the defendant of the constitutional right to a jury trial and is subject to a harmless error analysis. See State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000). A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

An instruction on a defense must be given if fairly raised by the proof regardless of whether the defense relies on the theory or requests that an instruction be given as to that theory. See State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001); see also State v. Allen, 69 S.W.3d 181, 187-88 (Tenn. 2002); Alfonzo Williams v. State, No. W2008-00106-CCA-R3-PC, Shelby County, slip op. at 6 (Tenn. Crim. App. July 29, 2009) (applying the supreme court's holding in State v. Allen involving lesser included offenses to defenses). "In determining whether a defense is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." Sims, 45 S.W.3d at 9 (citing Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)); see also State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has

been presented which reasonable minds could accept as a defense, "the accused is entitled to the appropriate instructions." Johnson, 531 S.W.2d at 559.

The record reflects that the Defendant did not request jury instructions regarding the defenses of duress or necessity. We must determine whether the defenses were fairly raised by the proof, which would have required the trial court to give the appropriate instructions.

Duress is a defense when a person is threatened "with harm which is present, imminent, impending and of such nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done." T.C.A. § 39-11-504(a) (emphasis added). Duress is an excuse for criminal conduct engaged in to avoid death or serious bodily injury. See id. § 39-11-504 Sent'g Comm'n Comments. Taken in the light most favorable to the Defendant, the evidence showed that the Defendant felt threatened by his former employees while they were in the fenced lot, and he was afraid that Hunt was going to his truck to retrieve a tire iron. Although he felt that Trevor Hamlin's actions in the fenced lot were an assault, the Defendant did not state that Hamlin threatened him or touched him in a manner that would induce a fear of death or serious bodily injury if he did not commit the theft. Considering the proof of Hamlin's actions at the intersection in the light most favorable to the Defendant, Hamlin's "reaching and grabbing" at the Defendant might be viewed as an assault. However, the Defendant was not threatened with death or serious bodily injury as a condition of his committing the theft of the van because he had already taken the van. We conclude that the proof does not fairly raise the defense of duress and that the trial court was not required to instruct the jury on the defense of duress.

The Defendant also argues that the trial court committed plain error when it failed to instruct the jury concerning the defense of necessity. Necessity is a defense to prosecution because it justifies behavior when:

> (1) The person reasonably believes the conduct is immediately necessary to avoid imminent harm; and
>
> (2) The desirability and urgency of avoiding the harm clearly outweigh, according to the ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

T.C.A. § 39-11-609.

Taken in the light most favorable to the Defendant, the proof showed that the Defendant felt threatened in the fenced lot of the Roto-Rooter facility. It was late and dark,

and he was in the fenced lot with three men approaching him. The men told him he had a certain number of minutes to complete the unloading of the van. He sensed an altercation and returned to the van to avoid it. The Defendant also believed that Hunt was going to retrieve a tire iron to use as a weapon. The Defendant was then pursued by the other Roto-Rooter technicians, and he was afraid to return to his personal vehicle because he might be involved in a fight.

The undisputed testimony at the trial was that the Defendant was supposed to unload his tools from the van. The Defendant admitted that the men in the fenced lot did not verbally threaten the Defendant with harm, although the Defendant felt afraid. According to the Defendant's testimony, they told him that he had a certain amount of time to unload the van. He felt afraid by being approached by the other men, but he also knew that he was supposed to be unloading the van. When he was being followed, one of the other technicians attempted to retrieve the keys of the van the Defendant was driving, and the Defendant felt that he had been physically assaulted. However, he had already taken the van by that time. Even if we accredit the Defendant's testimony that the Defendant was fearful due to the approach of his former co-workers, we cannot conclude that the Defendant needed to commit the theft of the van in order to avoid imminent harm. The record reflects no evidence of imminent harm to the Defendant. Finally, the record does not reflect a desirability or an urgency of avoiding some type of harm outweighed the offense of theft. The trial court's lack of instruction on the defense of necessity was not error.

In consideration of the foregoing, we reverse the judgment of the trial court because it failed to instruct the jury on the lesser included offense of unauthorized use of a vehicle, and we remand the case for a new trial.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE