IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 25, 2022

## STATE OF TENNESSEE v. JAMES CLARK MCKENZIE

**Appeal from the Criminal Court for Knox County**
**No. 117046   G. Scott Green, Judge**
_____

**No. E2021-00445-CCA-R3-CD**
_____

Defendant, James Clark McKenzie, was convicted by a jury of possession with the intent to sell, deliver, or manufacture more than 0.5 grams of cocaine within 1,000 feet of a drug-free zone, unlawful possession of a firearm by a person previously convicted of a felony drug offense, unlawful possession of a firearm by a person previously convicted of a violent felony, possession of a firearm with the intent to go armed during the commission of a dangerous felony, and tampering with the evidence.  The trial court imposed a total effective sentence of fifteen years.  On appeal, Defendant contends the evidence is insufficient to support his conviction for possession with the intent to sell more than 0.5 grams of cocaine within a drug-free zone and that the trial court erred in sentencing him under the 2019 version of the Drug-Free School Zone Act.  Following our review of the record and the briefs of the parties, we affirm the judgments of the trial court.  However, we conclude that the trial court erroneously sentenced Defendant in count two, possession of a firearm by a person with a previous felony drug conviction, and remand for entry of an amended judgment as to that count only.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Criminal Court**
**Affirmed in Part; Reversed in Part; Remanded**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and ROBERT H. MONTGOMERY, JR., J., joined.

J. Liddell Kirk, Madisonville, Tennessee, (on appeal), and Clinton Frazier, Maryville, Tennessee (at trial), for the appellant, James Clark McKenzie.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Larry Dillon, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

This case arose when officers of the Knox County Police Department and the Special Operations Squad executed a search warrant of Defendant's residence at 2300 Center Avenue in Knoxville. The search yielded drugs, drug distribution paraphernalia, a semi-automatic rifle with a silencer, ammunition for the rifle and a loaded magazine for another firearm.

A Knox County Grand Jury entered a true bill charging Defendant with possession with the intent to sell, deliver, or manufacture more than 0.5 grams of cocaine within 1,000 feet of a park, a Class B felony; possession of a firearm by a person with a felony drug conviction, a Class C felony; possession of a firearm by a person with a felony crime of violence, a Class B felony; possession with the intent to go armed during the commission of a dangerous felony, to-wit: possession with the intent to sell, deliver, or manufacture cocaine, a Class D felony; and evidence tampering, a Class C felony. Defendant was also charged with three counts of the criminal gang enhancement statute. The trial transcript reflects that after resting its case, the State announced its decision not to proceed on the gang enhancement counts.

*Trial – November 9-10, 2020*

Donna Roach, a tech office manager for the Knoxville/Knox County Geographic Information System, testified that she prepared two maps with a 1,000 feet buffer around 2300 Center Avenue. The maps were received as an exhibit. Located within the buffer of 2300 Center Avenue was the Walter P. Taylor Recreation Center and the Williams Creek Urban Forest Park. On cross-examination, Ms. Roach acknowledged that the recreation center has since been torn down, but that the park still exists.

Monica Crutcher, superintendent of the Knoxville Parks and Recreation Department, testified that the Williams Creek Urban Forest Park fell under her supervision. Superintendent Crutcher identified the park on one of the maps prepared by Ms. Roach and confirmed the accuracy of the park's location and its existence in May 2019. Ms. Crutcher was aware that the recreation center had been torn down but could not recall when and whether it was still standing on May 28, 2019.

Officer Jacob Wilson of the Knoxville Police Department ("KPD") had worked multiple stints in the Organized Crime Unit where he investigated "street level, mid-level, and upper-level drug crimes[.]" Officer Wilson testified that he received specialized

training in undercover drug operation from the KPD, the Tennessee Bureau of Investigation ("TBI"), Law Enforcement Training Associates, and the Tennessee Gang Investigators Association, conducted multiple undercover operations with both state and federal law enforcement agencies, and was involved in sixty-three cases which led to the issuance and execution of twenty-five search warrants.

In May 2019, Officer Wilson, with the assistance of a confidential informant, had the residence located at 2300 Center Avenue under surveillance. Based on information obtained from the surveillance, Officer Wilson obtained a warrant to search the residence. The warrant was executed on May 28, 2019, around 1:30 p.m. by Officer Wilson and officers of the Special Operations Squad of the KPD, more commonly referred to as the "SWAT Team." As they approached the residence, Officer Wilson observed Defendant first standing in the threshold of the open front doorway and then fleeing to the interior of the residence. The SWAT team entered the residence and followed Defendant inside the house while Officer Wilson maintained a position outside. Defendant was arrested in the open doorway of the only bathroom in the house. Once Defendant was secured and the residence was cleared of any occupants, Officer Wilson entered the residence and took photographs. The residence was a two-bedroom house. One of the bedrooms was used for storage. The second bedroom appeared to be used as a bedroom and contained photographs of Defendant and men's clothing in the closet.

Officer Wilson identified the items that were seized during the search in a series of photographs which were exhibited to the jury. Among the items were a white powder substance in a plastic bag which tested positive for cocaine in a field test; a black, AR-15 rifle with a loaded 30-round magazine; a .45 caliber loaded magazine for a Smith & Wesson handgun; a black digital scale with powder residue; and a metal measuring spoon with powder residue.

Officer Wilson explained the significance of finding powder residue on the digital scale and the measuring spoon:

> That's evidence, in my training and experience, that both of those items have been used as drug distribution paraphernalia. It's common for drug distributors to weigh out quantities of whatever substance that they're selling prior to packaging it or prior to selling it so that they know exactly what weight that they're selling to a customer.
>
> Also, the measuring spoon is typically used to measure out various quantities of drugs, including cocaine, whether that – that measurement is being placed into water with baking soda to be made into crack cocaine or measuring out powder itself to be weighed on the scale. So, it's significant that both of

those had the powdery residue on it to – to show evidence that – that they've been used in the distribution of cocaine.

The measuring spoon and the plastic bag with the white powdery substance were found on the floor near the bathroom where Defendant was taken into custody. The bag with the white powdery substance was later weighed on a digital scale at the KPD Organized Crime Unit office and its gross weight was 15.7 grams. Officer Wilson explained that the amount of the cocaine in the plastic bag suggested a distribution amount because it was large enough to be divided into smaller amounts for sale.

Officer Wilson testified that a number of small empty plastic bags were found in the toilet bowl. He testified that sellers use bags to package drugs for sale. He explained how plastic bags are used differently by a seller and a user:

> Typically, when you see large quantities of these baggies, especially when they are empty, it's indicative that this person possesses this paraphernalia with the intent to package some sort of narcotic or some sort of controlled substance to – to sell it. We can find these baggies with someone who has used, but typically it's a single baggie or maybe one or two that have been discarded in a vehicle that contain residue in it from where they've purchased that inside that baggie, used the contents of it, consumed the contents of its, and then discarded it. These all were unused baggies or appeared to be unused baggies in a large quantity.

Based on his experience and training, Officer Wilson opined that the plastic bags were discarded in an attempt to destroy evidence:

> It appears that there's some of them that have already made it down the toilet. And actually, when we entered the residence, the – the toilet was running. So, it had just been flushed. So, it's my belief, based upon that and the other drug paraphernalia or drug distribution paraphernalia evidence that's lying in and around the toilet now, that – that there were other substances or other items that were discarded or destroyed by flushing it down the toilet before we made entry and secured the Defendant.

In terms of the rifle and ammunition found in the residence, Officer Wilson testified that the AR-15 rifle was found in the closet of the bedroom which contained photographs of Defendant and men's clothing. The rifle was affixed with a silencer and a bipod and was loaded with a 30-round magazine in its well and a bullet in the chamber. The cartridges in the rifle magazine were "double stacked" in a side-by-side configuration. A magazine cartridge for a Smith & Wesson handgun was found in the same closet as the rifle. The

magazine was inside a man's tennis shoe and contained fourteen rounds. A Smith & Wesson handgun was not found in the residence.

Following the search, Officer Wilson and Detective Bruce Conky interviewed Defendant at the police station. Detective Conky was a task force officer in the Drug Enforcement Agency who retired prior to Defendant's trial. Officer Wilson testified that Defendant waived his rights and agreed to give a statement which was recorded on a video device at the police station. Defendant's redacted statement was played to the jury during Officer Wilson's testimony.

The recording shows Defendant seated with his hands cuffed behind his back talking to a man later identified as Detective Conky. Defendant tells Detective Conky that "I really want to talk to you about some s***." Detective Conky assures Defendant that he wants to talk to him "about anything" but that he needs to wait for Defendant to first be advised of his rights so that "everything is straightforward." Officer Wilson enters the room and Detective Conky asks him if he has the search warrant because Defendant "wanted to see it." Officer Wilson re-cuffs Defendant's hands in front so he can be seated more comfortably. Defendant reads the warrant, questions its validity and asks what was found in his residence during the search. Officer Wilson advises Defendant that over half ounce of cocaine and a rifle were found in the search. As Officer Wilson begins advising Defendant of his rights, Defendant joins in and recites the rights along with Officer Wilson. Officer Wilson advises Defendant to listen instead and respond when asked about each right. The recording is "paused" for a redacted portion and when it resumes, Detective Conky is heard asking Defendant the going rate for an ounce. Defendant responds, "about $1,300."

During the course of the interview, Detective Conky tries to elicit information about Defendant's supplier. Defendant expresses concern about his supplier and is unwilling to call his supplier in a controlled call from the police station. Defendant eventually replies that he got the drugs from "Doug" . . . a dude from Atlanta." Defendant states that he and "Doug" used to live together and at one time, Defendant had leased the house at 2300 Center Avenue to "Doug." Defendant admits that "Doug" will supply him with "whatever I want." He reveals that he "can get a kilo for $7,000," including "ice" and "H." When Detective Conky asks why there is a great interest in "ice," Defendant explains that "dogs can't smell 'ice.'"

During the interview, Defendant repeatedly asks the officers "what are you going to do for me?" Officer Wilson explains that they need to verify any information Defendant provides. Defendant states that he is "100% real" in talking to the officers. Defendant expresses that he is fearful that talking to the officers might "get him killed" because "you

took my rifle (during the search)." Defendant states that "Doug" had his cousin "killed." Detective Conky tells Defendant that he cannot promise Defendant anything.

As for the rifle, Defendant tells the officers that he purchased it from three men "maybe an hour or two" before the search. The rifle was purportedly used in a robbery where someone was killed. At least one of the men who sold him the rifle was in the house when law enforcement arrived to execute the search warrant. Defendant states that the man "weaseled out the back door." Defendant indicates that he does not know what a suppressor is and maintains that he had "never" used the rifle and adds that he does not carry guns or keep any in his home except for the rifle found in the search. He admits that he purchased the rifle "to protect himself" if things turn awry "overseas." Toward the end of the recording, Defendant admits to flushing the drugs down the toilet when the Special Operations Squad entered the residence.

After the recorded statement was played to the jury, Officer Wilson testified that the recording accurately represented the interview and that during the interview, Defendant provided information consistent with the investigation. Defendant admitted that his fingerprints would be found on the rifle which he purchased for $300 from a woman right before the warrant was executed. In addition to the rifle, drugs, and drug distribution paraphernalia, Officer Wilson testified that he seized four phones. One of the phones was forensically extracted and was brought to the interview room during Defendant's interview.

Officer Wilson testified that people involved in an illegal drug enterprise will "take measures to safeguard their residences beyond what is typically seen with ordinary citizens." According to Officer Wilson, such safeguards are commonly used by dealers to protect their drugs, money, or weapons. In this case, Officer Wilson observed a make-shift barricade on the back door of Defendant's residence.

On cross-examination, Officer Wilson acknowledged that he did not know when the make-shift locking mechanism was installed on the back door and did not recall Defendant stating when he moved into the house at 2300 Center Avenue. Officer Wilson agreed that he and Detective Conky were trying to get information about other people during the interview and that Defendant in fact provided some information that was later corroborated. He explained that in the video of the interview, he can be seen leaving the interview room several times to corroborate Defendant's information.

Officer Wilson agreed that drug dealers can also be users. He stated that in his experience and training, it is not unusual for a person caught with "a certain amount of drugs" to claim that the drugs are for personal use. He acknowledged that while a user may purchase a large amount, doing so is "very uncommon" and based on market value,

Officer Wilson maintained the amount of cocaine found in Defendant's house suggested possession for distribution:

> I will agree that while it's not unheard of [for a person to purchase a large quantity of a drug for personal use], that it's very uncommon. Based on my training and experience and knowledge of drug current trends, prices of drugs, I know that the half ounce quantity that was recovered from the residence at 2300 Center Avenue during the execution of our search warrant has an approximate street value of about $600.00, and that's going off the current trend of about $1,200.00 for an ounce of cocaine.

Officer Wilson testified that a cocaine user typically keeps under a gram and will usually have some kind of device to ingest the cocaine or smoke the cocaine such as a shortened straw, or a pipe or a soda can fashioned into a pipe. He stated that no such devices were found in the search of Defendant's residence. Officer Wilson also agreed that purchasing a large amount of cocaine will generally discount the price of the drugs per unit and that "it is a possibility" for a person to purchase a large quantity of drugs if the drugs were of "higher quality."

Officer Wilson did not know the weight of the drugs Defendant flushed down the toilet but based on information learned in Defendant's interview, he knew that the amount of what was flushed was larger than the amount that was recovered Officer Wilson maintained that the amount of cocaine, the paraphernalia used to measure the cocaine, the rifle and the ammunition suggest that Defendant was operating a drug distribution from his residence.

The plastic bag with the white powdery substance was submitted to the TBI for analysis. Special Agent Jacob White, a forensic scientist at the TBI analyzed the substance and detailed his findings in a report which was exhibited to the jury. Agent White testified that the substance was cocaine and its net weight was 14.35 grams. On cross-examination, Agent White stated that the substance was not tested for its purity.

Sergeant Brian Dalton, the forensic firearm and tool mark examiner in the KPD, examined the rifle, the two magazines, and the cartridges in the magazines. Sergeant Dalton identified the firearm as an AR-15 platform modern sporting rifle manufactured by Colt. He indicated that the AR-15 was a civilian copy of the military M16 version because it was semi-automatic and equipped with a safety feature. He tested the trigger pull of the AR-15 and confirmed that it met factory specifications. The barrel of the rifle was equipped with a suppressor or silencer which had no markings such as a serial number, the name of the manufacturer, and the location of its manufacture. The lack of markings

suggested that the suppressor was illegal but it was operational.  The rifle also had a scope and was also attached to a bipod.

Sergeant Dalton examined the magazine for the rifle.  The magazine was loaded with fourteen .223 caliber cartridges and  had a capacity of thirty cartridges.  He test-fired the rifle and dusted the rifle for fingerprints to determine whether the rifle had been used in another crime.  He confirmed that the rifle was operational as designed and the matching cartridges in the magazine were functional.  The rifle was not connected to other crimes.  Sergeant Dalton also examined a .40 caliber Smith & Wesson pistol magazine which had the capacity to hold sixteen cartridges.  There were fifteen cartridges in this magazine.

Before the State rested its case, the parties made the following stipulation regarding the two firearm counts:

> On May 28, 2019, the Defendant, James Clark McKenzie, had a prior felony which qualifies under T.C.A. Section 39-17-1307(b)(1)(B).

> On May 28, 2019, the Defendant, James Clark McKenzie, had a prior felony which qualifies under T.C.A. Section 39-17-1307(b)(1)(A).

The trial court instructed the jury that "[t]he fact Mr. McKenzie may have suffered a conviction at some point in time in his past in no way impairs his presumption of innocence in this case."  The State thereafter rested its case.  Defendant did not testify or offer proof.  Based on the evidence, the jury convicted Defendant as charged in the five counts of the indictment.

*Sentencing – January 11, 2021*

Prior to sentencing, the trial court noted that Tennessee Code Annotated section 39-17-432 was amended effective September 1, 2020, and asked the parties for their position on which version of the statute was applicable in sentencing Defendant in count one.  The State argued that the earlier version of the statute applied because the amendment did not indicate "in its silence or in its writing that it's retroactive."  The trial court questioned whether the Criminal Savings Clause was applicable, reset the hearing so it could consider the applicability of the statute in question, and asked the parties to "get me anything and everything that you can that supports your position on the application of the amendments to 39-17-432."

The sentencing hearing resumed and the trial court announced that Defendant was subject to the earlier version of the statute based on the plain language of Public Chapter 803, section 12 of the Public Act: "This act shall take effect September 1, 2020, the public welfare requiring it, and applies to offenses committed on or after that date."

Because no notice for range of punishment had been filed, the trial court applied the earlier version of Code section 39-17-432 and sentenced Defendant as a Range I offender in all five counts, imposing an effective fifteen-year sentence: twelve years for possession with the intent to sell or deliver cocaine, with the first eight years of the sentence to be served at one-hundred percent, *see* T.C.A. § 39-17-432(c) (2019) (count one); twelve years for possession of a firearm with a previous conviction for a violent felony (count three); three years at one-hundred percent for possession of a firearm during the attempt to commit a dangerous felony (count four); and six years for evidence tampering (count five). The trial court did not announce a sentence for unlawful possession of a firearm with a previous conviction for a drug felony conviction (count two); however, the judgment form for count two reflects that Defendant was sentenced to twelve years and that count two merged with count three. The trial court ran all counts concurrently except for the mandatory consecutive three-year sentence in count four for possession of a firearm with the intent to go armed during the commission of a dangerous felony. *See* T.C.A. § 39-17-1324(e)(1) (2019).

At the hearing on his motion for a new trial, Defendant again challenged his sentence for the possession with intent to sell within a drug-free zone arguing that the Criminal Savings Statue applied and he should have been sentenced under the amended statute. He also argued that the under the amended statute, the park zone was located beyond 500 feet. The trial court denied this claim based on the plain language of the public chapter, denied all other claims, and overruled the motion for a new trial. It is from these judgments that Defendant filed a timely appeal.

**Analysis**

**I.       Sufficiency of the Evidence**

Defendant contends that the evidence is insufficient to support his conviction for possession with the intent to sell more than 0.5 grams of cocaine because the cocaine found in his possession was for his personal use. As supporting proof, he relies on Officer Wilson's testimony that it was "not unheard of" for a user to purchase a large amount of drugs to get a discounted price per unit and to purchase cocaine at greater purity. The State argues that the evidence shows Defendant possessed the cocaine with the intent to sell

based on the amount of the cocaine, the presence of materials commonly used to weigh, measure, and package cocaine, the AR-15 rifle, and Defendant's confession to Officer Wilson that he did in fact sell drugs. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. "A guilty verdict 'removes the presumption of innocence and replaces it with a presumption of guilt.'" *State v. Reynolds,* 635 S.W.3d 893, 914 (Tenn. 2021) (quoting *State v. Gentry,* 538 S.W.3d 413, 420 (Tenn. 2017)); *State v. Allison,* 618 S.W.3d 24, 33 (Tenn. 2021). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *Allison,* 618 S.W.3d at 33; *State v. Jones,* 589 S.W.3d 747, 760 (Tenn. 2019). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *Allison,* 618 S.W.3d at 33-34 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also* Tenn. R. App. P. 13(e). This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

On appeal, "all reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded." *State v. Weems*, 619 S.W.3d 208, 221 (Tenn. 2021) (same standard of review applies when examining the sufficiency of the evidence and a motion for judgment of acquittal). As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017). Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021); *Allison,* 618 S.W.3d at 34. We defer to the jury's credibility determinations because a jury is in the best position to assess a witness's credibility:

> The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Williams*, 558 S.W.3d at 639 (quoting *Bolin v. State*, 405 S.W.2d 768, 771 (1966)).

Here, Defendant challenges his conviction for possession with the intent to sell more than 0.5 grams within a drug-free zone. In Tennessee, "[i]t is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(4) (2019). At the time of the instant offense, the Drug-Free School Zone Act was invoked when the offense occurred within 1,000 feet of a designated drug-free zone. *Id.* § 39-17-432(b)(1) (2019).

Possession of a controlled substance may be actual or constructive. *State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013) (citing *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001)). The intent of the possession "may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419. Such "other relevant facts" that can give rise to an inference of intent to sell or deliver include the weight and street value of the drugs, the packaging of the drugs, the presence of a large amount of cash, and the presence of weapons. *See State v. Nelson,* 275 S.W.3d 851, 867 (Tenn. Crim. App. 2008) (sufficient circumstances from which the jury could reasonably infer that the defendant intended to sell the cocaine where defendant was spotted in a location known for illegal drug sales, in possession of cocaine inconsistent with personal use, coupled with $114 in cash and a check for an unspecified amount); *State v. Logan,* 973 S.W.2d 279, 281 (Tenn. Crim. App. 1998) (a large amount of cash found in conjunction with several small bags of cocaine provided sufficient evidence of intent to sell); *State v. Brown*, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995) (the absence of drug use paraphernalia and the manner of packaging of drugs supported an inference of intent to sell); *State v. Matthews*, 805 S.W.2d 776, 782 (Tenn. Crim. App. 1990) (finding testimony of amount and street value of 30.5 grams of cocaine was admissible to infer an intention to distribute).

Viewing the evidence in the light most favorable to the State, the proof established that Defendant possessed more than 0.5 grams of cocaine with the intent to sell or deliver within 1,000 feet of a drug-free zone. First, the white powdery substance in the plastic bag found next to Defendant's feet at the time of his arrest constituted cocaine and weighed 14.35 grams. Second, the weight and street value of the cocaine was consistent with the intent to distribute. Third, Defendant was in possession of paraphernalia commonly used to measure, weigh, and package drugs for sale or distribution. Specifically, officers found a digital scale, a metal measuring spoon, and a number of empty plastic bags. Officer Wilson testified that both the digital scale and the measuring spoon contained powder residue, which was consistent with both devices having been used to weigh and measure cocaine for distribution. He also testified that plastic bags are commonly used to package drugs in smaller units to be sold to users. Moreover, the loaded AR-15, the matching ammunition, and the makeshift barricade at the back of the house evinced an intent to safeguard the drugs in the residence. Finally, Defendant admitted in his police interview

- 11 -

to selling drugs. Such facts, overwhelmingly and convincingly, give rise to the inference that the cocaine in this case was for distribution, not for personal use.

Defendant argues that Officer Wilson's testimony supports his claim that a user can possess a large amount of drugs for personal use. However, Officer Wilson also testified that in this case, the evidence collected suggested possession of the cocaine for sale. Officer Wilson also stated that the lack of devices to ingest or smoke the cocaine militated against possession for personal use. In addition to Officer Wilson's testimony, the jury also watched Defendant's interview wherein he admitted to selling drugs supplied by "Doug," and admitted to buying the rifle to protect himself. By their verdict, the jury concluded that Defendant possessed the cocaine with the intent to sell or deliver.

Defendant does not challenge the jury's finding that this offense was committed in a drug-free zone as part of his sufficiency argument. He has instead challenged the Act with regard to his sentence. In any event, the record supports the jury's determination that Defendant possessed the cocaine with the intent to sell or deliver within 1,000 feet of a park. Defendant is not entitled to relief, and this conviction is affirmed.

## II.      Sentencing

Defendant contends that the trial court erroneously sentenced him under the Drug-Free Zone Act ("the Act") in effect at the time he committed the offense of possession with the intent to sell or deliver 0.5 grams or more of cocaine within a drug-free zone. He argues that the Criminal Savings Statute ("Savings Statute") operates to entitle him to a lesser punishment because the Act does not expressly preclude its application. The State argues that the trial court properly sentenced Defendant under the Act at the time the offense was committed because the plain language of the amended Act's enabling legislation states that the amendment only applies to offenses committed on or after September 1, 2020. As for the Savings Statute, the State argues that the express language of the enabling legislation of the Act created an exception to the general provision of the Savings Statute. We agree with the State.

To decide which version of the Act applies to Defendant's felony drug possession conviction, we must interpret its language. Issues involving statutory construction present questions of law which are reviewed de novo with no presumption of correctness. *Kampmeyer v. State*, 639 S.W.3d 21, 23 (Tenn. 2022); *State v. Keese*, 591 S.W.3d 75, 78-79 (Tenn. 2019); *State v. Gibson,* 506 S.W.3d 450, 455 (Tenn. 2016); *State v. Dycus*, 456 S.W.3d 918, 924 (Tenn. 2015). We determine legislative intent from the plain language of the statute, "read in context of the entire statute, without any forced or subtle construction which would extend or limit its meaning." *State v. Cauthern*, 967 S.W.2d 726, 735 (Tenn. 1998) (quoting *State v. Davis*, 940 S.W.2d 558, 561 (Tenn. 1997). When a statute is plain

and unambiguous, "we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." *Davis v. State*, 313 S.W.3d 751, 762 (Tenn. 2010); *see also Keese*, 591 S.W.3d at 79. In the event of a conflict, a more specific statutory provision takes precedence over a more general provision. *State v. Welch*, 595 S.W. 3d 615, 622 (Tenn. 2020); *also Cauthern*, 967 S.W.2d at 735. "Generally, statutes are presumed to apply prospectively in the absence of clear legislative intent to the contrary." *State v. Thompson*, 151 S.W.3d 434, 442 (Tenn. 2004); *Cauthern*, 967 S.W.2d at 735. "The legislature may limit a new sentencing enactment to prospective application." *Patrick Simpson v. State,* No. 01-C-019203-CR00098, 1992 WL 335937, at *3 (Tenn. Crim. App., at Nashville, Nov. 18, 1992). Indeed, when construing a more recent statute in conjunction with pre-existing legislation, "we presume that the legislature has knowledge of its prior enactments and is fully aware of any judicial constructions of those enactments." *Davis*, 313 S.W.3d at 762; *see also Welch,* 595 S.W. 3d at 626.

Although not published with the rest of the statute in the Tennessee Code Annotated per standard practice, a statute's enabling provision is an expression of the General Assembly's intent regarding the statute. *Carter v. State,* 952 S.W.2d 417, 491, n.5 (Tenn. 1997); *see Cauthern,* 967 S.W.2d 726 at 735 ("[w]e conclude that the specific enabling provision of the 1993 act, which clearly states that the amendment applies to all offenses committed on or after July 1, 1993, controls").

At issue here are the amendments to Tennessee Code Annotated section 39-17-1324. As stated previously, it is unlawful for a defendant to knowingly possess a controlled substance with the intent to sell, deliver, or manufacture it. T.C.A. § 39-17-417(a)(4) (2019). At the time of the commission of the offense, the Act was triggered when a drug offense occurred within 1,000 feet of a designated drug-free zone. In May 2019, the Act provided in relevant part:

> A violation of § 39-17-417, or a conspiracy to violate the section, that occurs on the grounds or facilities of any school or within *one thousand feet (1,000')* of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park *shall* be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation.

*Id.* § 39-17-432(b)(1) (2019) (emphasis added). A defendant sentenced under the prior version of the Act was also "required to serve at least the minimum sentence for the defendant's appropriate range of sentence." *Id.* § 39-17-432(c) (2019).

The Act was subsequently amended to afford trial courts discretion in applying the sentence classification enhancement and reduced the distance for the enhancement from 1,000 feet to 500 feet of a drug-free zone's real property:

> A violation of § 39-17-417, or a conspiracy to violate the section, *may* be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) if the violation or the conspiracy to violate the section occurs:
>
> (A) On the grounds or facilities of any school; or
>
> (B) Within *five hundred feet* (*500'*) of or within the area bounded by a divided federal highway, whichever is less, the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, public library, recreational center, or park.

*Id.* § 39-17-417(b)(1) (2020) (emphasis added).  Under the amended Act, a defendant sentenced for violation of subsection (b) is no longer required to serve at least the minimum sentence.  *Id.* § 39-17-432(c)(1) (2020).  That requirement is now a presumption that can be overcome:

> There is a rebuttable presumption that a defendant is not required to serve at least the minimum sentence for the defendant's appropriate range of sentence.  The rebuttable presumption is overcome if the court finds that the defendant's conduct exposed vulnerable persons to the distractions and dangers that are incident to the occurrence of illegal drug activity.

*Id.* § 39-17-417(c)(2) (2020).

In general, "a criminal offender must be sentenced pursuant to the statute in effect at the time of the offense." *Keese*, 591 S.W.3d at 82 (quoting *State v. Smith,* 893 S.W.2d 908, 919 (Tenn. 1994)).  "When a penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, the offense, as defined by the statute or act being repealed or amended, committed while the statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense."  T.C.A. § 39-11-112 (Criminal Savings Statute).  "The 'exception' to the savings statute is when 'the subsequent act provides for a lesser penalty, [in which case] any punishment imposed shall be in accordance with the subsequent act.'" *State v. Ariel Ben Sherman*, No. E2006-01226-CCA-R3-CD, 2007 WL 2011032, at *4 (Tenn. Crim. App. July 12, 2007), *aff'd*, 266 S.W.3d 395 (Tenn. 2008); *see State v. Menke,* 590 S.W.3d 455, 468-70 (Tenn. 2019) (because amendments to the theft grading statute effectively changed and provided for a lesser penalty than its previous version, the Savings Statute

was satisfied, and the amended version was applicable where the offense occurred before the amendment's effective date but defendant was sentenced after the effective date) *cf. Keese,* 591 S.W.3d at 84 (Savings Statute inapplicable where defendant was convicted and sentenced before effective date of the amendments to the theft grading statute); *State v. Tolle,* 591 S.W.3d 539, 545-46 (Tenn. 2019) (Savings Statute did not apply to authorize trial court to sentence defendant to a reduced grade of the convicted offense under amendment to theft grading statute upon revocation of defendant's probation). Furthermore, "a clear legislative directive regarding retroactive application is not required for a defendant to benefit from the lesser punishment imposed by the subsequent act." *Menke,* 590 S.W.3d at 470.

In this case, the legislature's intent of limiting application to offenses occurring on or after September 1, 2020, is expressed unambiguously in the language of the enabling provision for the Act which states, "This act shall take effect September 1, 2020, the public welfare requiring it, and applies to offenses committed on or after that date." 2020 Tenn. Pub. Acts, ch. 803, § 12. *See also State v. Douglas E. Linville*, No. W2019-02180-SC-R11-CD, --S.W.3d --, 2022 WL 1769068, at *1, n.2. (Tenn. June 1, 2022) ("The 2020 amendment [to T.C.A. §39-17-432] applied to offenses that occurred on or after September 1, 2020"). This specific language of the enabling provision is essentially the same as the enabling language our Supreme Court interpreted in *Cauthern* to supersede the Savings Statute. *Cauthern*, 967 S.W.2d at 735. Defendant committed the offenses on May 28, 2019. Thus, by its terms, the September 2020 amendments to the Act do not apply to Defendant. *See Larry Catron v. State,* No. 03C01-9310-CR-00358, 1994 WL 176971, at *1 (Tenn. Crim. App., at Knoxville, May 11, 1994) (Sentencing Reform Act of 1989 not retroactively applicable to petitioner where the language of the statute and the enabling legislation plainly states that the statute applies to offenders who are sentenced after the effective date); *see also State ex re. Bobby L. Crum v. McWherter,* No. 02-C01-9108-CC-00181, 1992 WL 99029, at *2 (Tenn. Crim. App., at Jackson, May 13, 1992); *William Moree v. State*, No. E2005-02302-CCA-R3-HC, 2007 WL 465113, at *1 (Tenn. Crim. App. Feb. 13, 2007).

In addition to the plain language of the enabling provision, the legislature's intent of applying the 2020 amendments to drug-free zone offenses committed on or after September 1, 2020 is confirmed by the most recent passage of Public Chapter No. 927. Under Public Chapter No. 927, a defendant who was sentenced under the pre-2020 version of the Act for offenses committed before September 1, 2020, may petition to be re-sentenced under the 2020 amendments. *See* Act of April 11, 2022, ch. 927 § 1 ("the court that imposed a sentence for an offense committed under this section that occurred prior to September 1, 2020, may, upon motion of the defendant or the district attorney general or the court's own motion, resentence the defendant pursuant to [2020 amendments]"); *see also Linville*, 2022 WL 1769068, at *1, n.2 ("the statute was amended once again in 2022

- 15 -

to create a procedure whereby defendants convicted of offenses that occurred before September 1, 2020, are eligible for resentencing under the provisions enacted by the 2020 amendment"). To dispel any confusion, this most recent amendment to Tennessee Code Annotated section 39-17-432 "applies to sentencing for offenses committed before September 1, 2020." *See* Act of April 11, 2022 , ch. 927, § 2.

Here, the trial court properly sentenced Defendant in count one under the 2019 Act in accordance with the specific enabling provision of the Act. Defendant committed the relevant offense on May 28, 2019. He was sentenced as a Range I offender to twelve years with the first eight years of the sentence to be served at one-hundred percent. Possession with the intent to sell or deliver more than 0.5 ounce of cocaine within 1,000 feet of a drug-free zone is a Class B felony. *See* T.C.A. § 39-17-417(c)(1) (2019). The range of punishment for a Range I offender convicted of a Class B felony is "not less than eight (8) nor more than twelve (12) years[.]" *Id.* § 40-35-112(a)(2) (2019). Because a felony drug offense committed within a park is not subject to an enhanced classification, the trial court properly sentenced Defendant to a twelve-year sentence. *Id.* § 39-17-432(b)(3) (2019). Defendant is not entitled to relief.

Although not raised in the motion for a new trial or as an error on appeal, the judgment form for count two reflects an incorrect sentence of twelve years. *See, e.g.,* Tenn. R. App. P. 36(b) (when necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time). In count two, Defendant was convicted of unlawful possession of a firearm by a person previously convicted of a felony drug offense, a Class C felony. T.C.A. §§ 39-17-1307(b)(1)(B), 39-17-1307(b)(3). The sentence range for a Range I, Class C felony is three to six years. *Id.* § 40-35-112(a)(3). The sentencing transcript shows that the trial court did not impose a sentence for count two but mistakenly referred to "count two" when declaring the sentence for count three, unlawful possession of a firearm by a person previously convicted of a violent offense, a Class B felony. *Id.* §§ 39-17-1307(b)(1)(A), 39-17-1307(b)(2). The trial court properly imposed a within-range sentence of twelve years for count three. *Id.* § 40-35-112(a)(2). Additionally, the trial court properly merged the Class C felony of count two with the Class B felony of count three and properly entered judgment forms for each of the merged counts. *See State v. Berry,* 503 S.W.3d 360, 364 (Tenn. 2015). Validity of the merger is not at issue. *Id.* at 362, n.2 (citing *State v. Watkins,* 362 S.W.3d 530, 556 (Tenn. 2012)). However, no sentence was declared for count two at sentencing. Yet, the judgment form for count two reflects the same twelve-year sentence imposed for count three. Accordingly, we modify Defendant's sentence in count two to reflect an in-range sentence of three years and remand for entry of an amended judgment form for count two.

**Conclusion**

For the foregoing analysis, the judgments of the trial court are affirmed but remanded for entry of an amended judgment form in count two.

_____

JILL BARTEE AYERS, JUDGE